42 206
118 301

42 206
136 [5]196

42 206
f150 [8]350

42 206
e146 [10]469

42 206
152 195
153 [13]707
153 710

ALEXANDER FRASER, FRANCIS P. FRASER, ELLIS P. FRASER, MARY COLVIN ET AL. v. WILLIAM JENNISON ET AL., PROPONENTS OF THE WILL OF ALEXANDER D. FRASER.

*Separate right to peremptory challenges—Opening to the jury—Conclusions of witness—Leading questions—Expert evidence as to testator's sanity—Physician's testimony—Drag-net questions—Testimony as to family history not hearsay—Trial of cases should be so managed as to avoid error.*

Where parties impleaded together appear by the same counsel, and after their right of peremptory challenge is exhausted, other counsel take charge of the case for part of them, the latter have no farther right of challenge.

Contestants in a will case offered in their opening to read to the jury a passage from a work on mental diseases, enumerating certain causes of insanity. *Held* that the court properly refused to allow it.

The question in a will case whether or not the testator was an eccentric man is not objectionable as calling for a conclusion instead of a fact.

The contestants of a will put the following questions: "Did you notice during the spring any weakening of [testator's] mind?" and "In your opinion, during the spring of 1877, had [testator's] mind weakened?" *Held* that these questions were not leading.

A trustee named in a will was also a subscribing witness, and testified to its due execution and the testator's sanity. He was asked on cross-examination as to whether he had proved a claim

against the estate, and an offer was made to show that the witness had himself drawn the will, that testator was very old, and that before his will was made he had been prompt to pay his debts. *Held* proper to exclude the question and the testimony. The witness was not so interested in the will, either as trustee or as claimant, as to affect his testimony, and the evidence could at most raise a mere suspicion that his claim was unfounded or that the testator had become mentally dependent or helpless. If the claim was valid it made no difference whether the will was sustained or not, and if the claim was unfounded it should have been disputed when presented for allowance and when its validity was the question at issue.

The fact that a testator had expressed regret that he had made a particular bequest has no bearing on his mental capacity.

The error of admitting a will in evidence without having called a particular subscribing witness out of several, to prove its due execution, is cured by calling him afterwards and allowing the contestants to cross-examine him.

Error will not lie on a direction to counsel not to spend time on certain issues as their opening to the jury would not warrant it, where, though counsel excepted to the ruling, they made no suggestion at the time that anything had been omitted from the opening, and did not afterwards offer evidence to establish the excluded issues, or necessarily tending to establish them.

Expert evidence should be confined within reasonable bounds; and where the contestants of a will had examined five experts to show testator's mental condition, it was *held* proper to decline to allow another to be called.

The rule excluding a physician's testimony as to matters learned while attending a patient (Comp. L., § 5943) may be waived by the patient or by those who represent his interests after his death; and it will not prevent the proponents of a will from showing the testator's competency by the evidence of his physician.

Letters showing friendly relations with a brother are not admissible many years afterward as tending to show that the writer, in not leaving any bequest to the brother's children, with whom friendly intercourse had not been kept up after the brother's death, had so lost his natural affection as to indicate insanity; and affectionate letters to and from other relations, equally remote, to whom, however, he had left bequests, though they may not be strictly inadmissible, may be properly excluded.

In a will case in which the testator's sanity is in issue, an omnibus question to an expert, presenting a hypothesis covering many things of which there was neither proof nor offer of proof, including conditions which necessarily indicated insanity as well as facts which might co-exist with a state of mental soundness,

and going not only into the history, eccentricities and physical condition of the testator, but into the personal traits of his relations, is properly excluded as tending to make the jury suppose that each of the enumerated circumstances indicated insanity, and to leave them at discretion to decide whether the will was suitable and proper and satisfied their judgment.

Incapacity, either criminal or civil, must for legal purposes be judged of by manifestations in conduct or language; symptoms of insanity which only physicians can perceive and which have no apparent effect upon one's ability to transact business are not enough to vitiate one's civil acts.

It is intended by the Statute of Wills that every person shall be at liberty, in making his will, to select the objects of his bounty among his relations at discretion, or to pass them all by if so disposed.

A will is not necessarily to be set aside on proof that the testator suffered from a mental disorder when it was executed; it must also be shown that it affected the provisions of the will.

Derangement of the mental faculties ought not to incapacitate one from making his will if it does not make him incapable of acting rationally in the ordinary affairs of life, or manifest itself in the testamentary provisions.

A will ought not to be overturned without reasons that are intelligible to the common sense of mankind.

Testimony that a witness knows by repute that her father and his brother came to the State together, and that they were the only two brothers of the family that did come to the State, is not objectionable as hearsay.

An examiner should avoid an objection to the form of a question by changing its form, instead of relying upon bringing error on a ruling sustaining the objection.

Parties should so manage their cases in the trial courts as fully to develop their merits in order that the verdict and judgment may be final; and in will cases this is particularly important.

Where it does not appear that adverse rulings have prevented a party from making a full showing of the case, the appellate court may decline to disturb the judgment for errors in overruling questions on formal objections, when their exclusion does not appear to have done injury.

It is not error to refuse requests for instructions to the jury where the court gives a connected charge that is fair and sufficiently full to present all the important questions of law with which the jury have anything to do, and is likely to guide the jury better than the instructions asked.

Error to Wayne.    Submitted Oct. 28.    Decided Nov. 29.

APPEAL from probate of a will. Contestants bring error.

*Henry M. Duffield* and *Griffin & Dickinson* for plaintiffs in error, cited as to the admissibility in proceedings to contest a will, of evidence of a testator's physical condition and of his eccentricities, and antecedents, Maudsley's Responsibility in Mental Disease, pp. 55–6, 72, 75; Brown's Med. Jur. of Insanity, p. 103; changes in the testator's disposition may be shown as bearing on the question of sanity, Redf. Wills, 67, 69; as also may his statements inconsistent with bequests already made, *Harring v. Allen*, 25 Mich., 508; evidence of delirious attacks to which testator's brother was subject are relevant, *People v. Garbutt*, 17 Mich., 9; *People v. Smith*, 31 Cal., 466; 1 Redf. Wills, 156–7. All the subscribing witnesses to a will should be called and examined by the proponent, *Hudson v. Kersey*, 4 Burn. Ecc. Law, 91; *Bootle v. Blundell*, 19 Ves. Jr., 501; *Ogle v. Cook*, 1 Ves. Sr., 177; *Chase v. Lincoln*, 3 Mass., 236; *Brown v. Wood*, 17 Mass., 768; *Thornton v. Thornton*, 39 Vt., 122; *Dean v. Dean*, 27 Vt., 750; *Ragland v. Green*, 22 Miss., 194; *Evans v. Evans*, 18 Miss., 402; *Jackson v. Vickory*, 1 Wend., 406; the testimony of a physician as to the mental state of his patient is inadmissible (*Johnson v. Johnson*, 4 Paige, 460; *People v. Stout*, 3 Park. Crim. Cas., 670; *Brand v. Brand*, 39 How. Pr., 193; *Rogers v. Lyon*, 64 Barb., 373), even after the patient's death, *Edington v. Mut. Life Ins. Co.*, 67 N. Y., 194; *Sloan v. N. Y. C. R. R.*, 45 N. Y., 128.

*William Jennison, William A. Moore* and *G. V. N. Lothrop* for defendants in error. It is not necessary to swear all of the subscribing witnesses in proving the due execution of a will, *Tatham v. Wright*, 2 Russ. & Myl. 1; *Lowe v. Jolliffe*, 1 W. Bl., 365; 1 Redf. Wills, §§ 8, 9; in contesting a will on the ground of insanity, the contestants cannot read to the jury from works on insanity as to its predisposing causes, *Com. v. Wilson*, 1 Gray, 337; *Washburn v. Cuddihy*, 8 Gray, 430; *Ashworth v. Kittridge*, 12 Cush., 193; *Collier v. Simpson*, 5 C. & P.,

73; 1 Redf. Wills, 146; 1 Greenl. Ev., § 440, *n*; the executors of a testator may waive the statutory privilege excluding a physician's testimony as to facts learned while attending on their decedent, *Cahen v. Cont. Life Ins. Co.*, 41 N. Y. Sup. Ct., 296; and the statute does not apply to testimony as to testamentary capacity; *Allen v. Public*, 1 Bradf., 221; *Kempsey v. McGinniss*, 21 Mich., 137; *Horn v. Pullman*, 72 N. Y., 275-6; nor to knowledge of matters apart from those which must be revealed in the line of medical treatment, *Baxter v. Abbott*, 7 Gray, 71; *Campau v. North*, 39 Mich., 606; *Johnson v. Johnson*, 4 Paige, 460; *Collins v. Mack*, 31 Ark., 684; *Hanford v. Hanford*, 3 Edw., 468; see *Alderman v. People*, 4 Mich., 422; letters from a testator to his devisees showing his relations to them are admissible in a contest of his will for testamentary incapacity, *Shailer v. Bumstead*, 99 Mass., 112; but their letters in reply are not relevant, *Cont. Ins. Co. v. Horton*, 28 Mich., 173.

COOLEY, J. This case involves the validity of the will of the late Alexander D. Fraser, of Detroit, one of the oldest and best known members of the Michigan bar. The will bears date May 17, 1877. It was proved and allowed in the probate court for the county of Wayne, and an appeal was taken from that allowance to the circuit court. A copy of the will is given in the margin.*

---

*In the name of God, Amen. I, Alexander D. Fraser, of the city of Detroit, State of Michigan, counselor at law, do make and declare this my last will and testament, in manner and form following:

I resign my soul into the hands of Almighty God, hoping and believing in a remission of my sins by the merit and mediation of Jesus Christ, and my worldly estate I give, devise and bequeath as follows:

1. I give and bequeath unto my neices, Margaret Davidson and Isabella Davidson, both of Inverness, Scotland, and to the survivor of them, the sum of $4000, the interest of which shall be quarterly or semi-annually transmitted by my executors or trustees to them, as has been heretofore done by me. This sum I estimate to be about the amount in which I am now indebted to them for moneys to which they succeeded through their mother's last will and testament, and which sum, therefore, I bequeath to them in full payment and discharge thereof, and on that condition. The amount transmitted by me heretofore, quarterly or semi-annually, has been twenty or forty pounds sterling, and should the interest accruing from said sum be inadequate to pay the premium of such amount, the residue

The decedent was upwards of eighty-three years of age at the time the will was made. The proponents of the will are special administrators on the estate, appointed by the Wayne probate court, and the contestants are children of Peter Fraser, a brother of the deceased, who, with others constitute his heirs at law. By their pleading the contestants set up the following defenses: *first*, they deny the due execution of the supposed will; *second*, they aver that at the time of the supposed execution the decedent was of unsound mind, and incapable of making a valid will; *third*, they allege that the will was the result of insane delusions in the decedent; *fourth*, they aver that the execution of the alleged will was procured by undue influence, but without specifying by whom the undue influence was exerted.

On the trial in the circuit court the contestants at first all appeared by the same counsel, and when the jury were called challenged peremptorily two whose names were drawn. Another counsel having then appeared to take charge of the case for two of the contestants, he claimed a right on their behalf to further peremptory challenges, but this was denied, and an exception taken. The ruling was within the decision in *Stroh v. Hinchman*, 37 Mich., 490, and requires no discussion.

---

may be paid from my estate. I enjoin upon my trustees or executors to be prompt and punctual in the transmission of this annuity.

2. I give and bequeath to another niece, Ann Munroe, of Inverness, aforesaid, for her own use and benefit, and excluding the *jus mariti*, the sum of $500.

3. I give and bequeath to Mrs. Octavia Seymour, of Detroit, the sum of $1000, in consideration of her constant attention and kindness to me during my illness.

4. I give and bequeath to William Adair and John Pettie, of Detroit, in trust for the St. Andrew's Society of Detroit, the sum of $500, which shall be permanently invested by said society when it shall have become duly incorporated under the laws of this State, the interest of which shall be regularly drawn and added to the benevolent fund of the society, and appropriated in all future time to the relief of any of the natives of Scotland living here who may be in necessitous circumstances, and under such regulations as the society may make from time to time.

5. I give and bequeath to the Rev. A. Fraser, minister, of the parish of Kirkhill, Aird (Free Church), Scotland, living at Bogroy, the sum of £50 sterling for the poor of his parish, to be appropriated under his direction.

The proponents began their evidence by calling all of the five subscribing witnesses except John Pettie, each of whom gave evidence tending to show the due execution of the will, and the sanity of the decedent at the time of execution. On the cross-examination of Mr. Bishop, he testified that Mr. Fraser about 1856 lost the sight of one of his eyes by paralysis, as he understood it. The contestants thereupon proposed to question the witness further with reference to this loss of eyesight, but the court excluded the proposed evidence.

When Mr. Jennison was cross-examined he was asked: "Did you prove a claim against the estate of A. D. Fraser, and if so, how much?" This question was objected to, and ruled out. The contestants then offered to give evidence that the will was drawn by Mr. Jennison, who was one of the trustees named in it; that during its execution Mr. Jennison and Mr. Pettie, another trustee,

6. I hereby bequeath to my friend, Robert McClelland, the "Chatham Correspondence," in four volumes, in testimony of our uniform friendship.

7. I give and bequeath to Mrs. Julian Williams the sum of $100, to be appropriated by her for the purchase of a ring to be kept as a token of our uniform friendship.

8. As to all and singular my real and personal estate which I now own or may own at the time of my death, and wheresoever situate and of what nature soever, I hereby give, devise and bequeath to William A. Moore, William Jennison, William Adair and John Pettie, of Detroit, Michigan, and their heirs and assigns forever, and their heirs and administrators respectively (not already disposed of), *but in trust only,* and for the uses and purposes hereinafter mentioned, and not otherwise:

1. The trustees, or a majority, or any two of them, shall take charge of all said real and personal property, and shall pay all dues and public burdens thereon, and sell and dispose of the same at such time and place and on such terms as to them shall seem proper. They shall lay out my property on the Chene farm, Detroit, in lots so that those lying between Woodbridge and Franklin streets may front on Chene street, and of such size as they shall think fit.

2. My said trustees and executors are especially enjoined to pay all care and attention to my beloved wife Caroline, whose health has suffered in consequence of my illness. This disposition is made to relieve her from all unnecessary care and anxiety in the settlement of my estate. My said trustees and executors shall provide all comforts for her that she may possibly require, and furnish her with such means as she may at any time need, and she may select her own residence. This kindness and attention I expect she shall receive during her natural life. It is my desire and intention that my said wife should be maintained and should live in the manner that she has been accustomed to.

were continuously present; that Mr. Fraser was then upwards of eighty-three years of age; that previous to that he had been a man prompt and particular in the payment of his debts; that upon his death Mr. Jennison and Mr. Pettie, two of the trustees, presented claims respectively for $4650 and $2500, the first for services in attending to Mr. Fraser's business, and the second for services as his nurse. This evidence was objected to and ruled out, as was other evidence of a similar nature. The witness was then asked whether Mr. Fraser did not afterwards express regret at having made the bequest to Mrs. Seymour; but this question also was overruled. The will was then offered in evidence by the proponents, but its reception was objected to, because Mr. Pettie, the fifth subscribing witness, had not been examined respecting its execution, the proponents declining to examine him at that time. The objection was overruled.

3. None of the legacies above specified shall be paid until my said real estate or an adequate portion thereof shall be sold and paid for, except the annuity payable to my said two nieces, Margaret and Isabella Davidson.

4. I direct that my trustees and executors shall procure and erect on my lot (30) in Elmwood cemetery a monument of Scotch granite to my family, and I do hereby constitute and appoint the said Wm. A. Moore, Wm. Jennison, Wm. Adair and John Pettie, or any two or more of them, to be the executors of this my last will and testament, and I dispense with any executors' or administrators' or trustees' bond, hereby revoking all former wills and codicils by me made.

Finally, on the demise of my said wife and the settlement of my estate and the payment of all expenses connected therewith, I direct my said trustees and executors to transmit to my two nieces last above mentioned, Margaret and Isabella Davidson, whatever balance or balances may remain in their hands. It being hereby my intention to give and devise to them whatever surplus may remain undisposed of to their use and benefit, and should any of said real estate remain undisposed of, to convey the same to them or the survivor of them. But it is my intention that in case of the death of both of my said nieces before the death of my said wife then their share shall go to their sister, Ann Munroe, of Inverness.

In witness whereof I have hereunto set my hand and seal at Detroit, this 17th day of May, in the year of our Lord one thousand eight hundred and seventy-seven.

A. D. FRASER.  [SEAL.]

Witnesses: ROBERT McCLELLAND.
D. BETHUNE DUFFIELD.
WM. JENNISON.
LEVI BISHOP.
JOHN PETTIE.

Counsel for contestants then opened their case to the jury, in the course of which he offered to read a passage from Griesenger on Mental Diseases, to the effect that grief, loss of fortune and disappointed ambition are among the causes of insanity; but the court very properly refused to permit it. At the close of the opening address, no part of which is given in the record, the judge said to counsel for contestants: "I will say to you in view of your opening that you need not spend any time on the question of undue influence. Your opening does not disclose that undue influence can be shown, or any undue influence such as could go to the jury. So you must confine yourself to the capacity of the testator." Counsel for the contestants excepted to this, but they did not then or at any subsequent time say to the court that they desired to go into evidence to establish the allegation in their pleading that undue influence had been employed, nor was any suggestion made that anything had been omitted in the opening.

Counsel for contestants then called Dr. Brodie, who testified that he had seen the sore on the nose of Mr. Fraser, which afflicted him more than twenty years ago; but on objection the evidence on this subject was ruled out.

Mary Colvin, one of the contestants, was then called, and testified that she was niece to the decedent, and daughter to his brother Peter: that she knew by repute that her father and the decedent came to Michigan together, and that they were the only two brothers of the family that did come to Michigan. The proponents objected to this evidence as being mere hearsay, and the court ruled it out.

Contestants then offered to prove that the relations between the decedent and Peter Fraser were always friendly and affectionate, and that the testator was in the habit of visiting his brother at his residence in Berrien in his life-time; but the offer, on objection, was overruled. They also asked Mary Colvin, "What rela-

tives have you living besides your brothers and sisters?" Whereupon proponent's counsel inquired whether the purpose was to show undue influence; and contestant's counsel making no response, the court overruled the question.

Contestants also offered to prove by this witness that Peter Fraser, in his life-time, upon the least chill or the slightest attack of illness, was subject to delirious fits; but the evidence was not received. The witness testified that Peter Fraser had been dead twenty years; that she never saw the decedent, and never saw or heard from the Misses Davidson mentioned in the will.

Letters by the decedent to Peter Fraser, dated in 1845 and 1851, were offered to prove the friendly relations existing between them, but they were ruled out.

The contestants then called a witness and offered to prove by him that Alexander J. Fraser, a son of the contestant, was a young man liberally educated by his father, admitted to the bar of Detroit, and gave fine promise; that early in his youth he became dissipated, and continued so during his life-time; that he died or was drowned in 1871 while under the influence of liquor in one of his sprees; that Mr. Fraser was well aware, during the latter part of his son's life, of his course of life and habit; and that the knowledge of his son's life and death continued to influence Mr. Fraser during his own life. This offer was overruled. In the same connection contestants stated that they expected to prove by one of the witnesses that Mr. Fraser, after he became insane, frequently alluded to his son Alec; but no witness was called to the stand to make such proof.

The contestants then called Samuel W. May and asked him whether or not the decedent was an eccentric man? The question was objected to as calling for a conclusion and not a fact, and was ruled out on that ground. The objection was untenable. It might as well be said that the questions whether a man was tall or not; whether he stooped in walking; whether he was

slow of speech and so on, are objectionable as calling for conclusions. All such questions involve conclusions, but they are nevertheless the proper and suitable questions to bring out the facts to which they are directed, whenever the evidence they call for is competent and material. It is therefore difficult to understand why this was objected to, especially as a favorable ruling must imperil the case. Evidence by the same witness that decedent was a peculiar man to get along with, and not every day alike, was struck out on objection.

One Augusta Mollenopski was then called, who testified that she had been constantly employed as a domestic in the family of the decedent for the four years immediately preceding July 1877. The following questions were then put to her, all of which were overruled:

"Do you know whether Mrs. Seymour wanted to come in the house and stay in charge of the house? Do you know whether Mr. Pettie forbade her coming into the house? Do you know whether Mr. Jennison was consulted with about Mrs. Seymour coming into the house? Do you know whether Mr. Jennison also objected to Mrs. Seymour coming into the house? Do you know whether Mrs. Seymour desired to come into the house and take charge of her uncle and aunt, and whether she was prevented from doing so by Mr. Jennison and Mr. Pettie?"

Other questions were then put to the witness as follows: "Did you notice during the spring any weakening of Mr. Fraser's mind?" "In your opinion, during the spring of 1877, had Mr. Fraser's mind weakened?" Both these questions were objected to as being leading, and were ruled out. Neither of the questions was open to the objection made. Both were entirely proper in form, and the witness should have been permitted to answer them.

Contestants then offered to prove that Miss Emma Morton, who was not remembered in the will, had for seventeen years before Mr. Fraser's death been in the habit of reading to him; that in the last three months of his life she nursed him and cared for him "with more than a daughter's devotion;" that she did this without

any promise of compensation on his part, but solely from affection; that so far as anything appeared that transpired between them decedent was very affectionate towards her and cared for her very much as a man would care for his daughter in his ordinary intercourse with her, and his desire to have her with him. This offer was overruled, though accompanied with the statement that experts will testify that in making their diagnosis this ingratitude is a material and important consideration.

Dr. Henry Hurd was then called, who testified that he was superintendent for the Eastern Asylum of Michigan for the Insane, and was familiar with mental diseases, their causes and symptoms. He was then asked: "Will you state if you please, what are certain uniformly recognized causes—predisposing causes—of mental disease?" The question was objected to and ruled out. The witness was allowed to state, however, that he should consider such delirious attacks as it had been proposed to prove in the case of Peter Fraser as material and bearing on the diagnosis of the case of the decedent. The contestants then renewed their offer to prove such attacks, but the evidence was not received.

Dr. Hurd was then asked the following question:

"Assuming that Mr. Fraser's nephew died insane; that at the date of the making of the alleged will, May 17th, 1877, Mr. Fraser was in his eighty-third year; that up to the year 1865 he had been a most laborious practitioner at the bar, and had as such performed more than the ordinary amount of labor; that in 1856, while arguing a cause in court, he had suddenly lost the sight of one of his eyes by what the physicians called *amaurosis;* that for twenty years he had suffered from an irritating and loathsome disease, known in medicine as *lupus exedens,* and located on the right cheek, near the nose and eye; that his physicians had informed him there was no cure but death; that although he had been all his life more than ordinarily fond of the society of friends, in the winter of 1876-7 he changed in this respect and became averse to their society, and declined to see them when they called, and abandoned meeting with the bar, of which he was president; that although

42 MICH.—28.

theretofore studiously neat in respect to his person and clothing, he became changed in this respect—was slovenly as regards his clothing; that he never washed himself or took a bath after the fall of 1876 until his death; that from a temperate man he became, after the winter of 1876, addicted to the free use of liquor; that during the last year of his life his memory began to fail him, and in the succeeding winter and spring of 1876 and 1877 he was in such a state in regard to ordinary affairs that he would frequently give orders · for a particular piece of work to be done, or particular kind of food to be prepared, and when it was done as directed he would deny having given any such order, and fly into a passion about it; that during the same time his attendants say he appeared silly and childish, doing such acts as the following: he would tell the housemaid to turn his wife's niece, to whom he left a thousand dollars in his will, off the steps, and not to let her in the house, and tell the cook not to let her have anything to eat, but when she came in would be pleasant to her; would call the daughter of the last named lady vile names, and forbade her the house; would, without cause, fall into a passion with his servants, whom he had always before treated kindly, and when told of it by his wife would say that he had done nothing, and then cry and beg them not to go away from him; he would stand in front of the looking-glass half an hour at a time, all the time brushing the few hairs he had on his head; that, having been a loving and affectionate husband, he in April, 1877, kicked his wife and called her vile names; that in March, 1877, he told his servant to go to his attorney and get $4000, and upon the servant's returning, Mr. Fraser put the money in a tin box in the closet, and said to the other servant to be very careful, that he had $4000 in there; that in April, 1877, his wife, who had faithfully attended him through his illness, became insane to a marked degree, and knowledge of the fact came to him, causing him to break down and give way to tears and emotion; assuming that these circumstances all preceded the making of the will, and assuming, further, that at the date thereof his disease had progressed so far that it had eaten away all of the upper lip and nose—the entire right eye had come away in a running matter a month before the execution of the paper; that at the time of the execution of the will, the disease had spread to the arch of the eye and nearly down the lower bone, while inwardly it had penetrated to the wall of the orbit of the eye—the membranes of the cheek about the eye were destroyed, the bone was perfectly bare of all the soft parts, and the upper portion of the maxillary bone had exfoliated

and come away in little pieces; that the day on the evening of which the paper was executed he was dressed as usual, but, shortly before the time appointed for its execution, he took off his clothes, and, directing the servant to hunt up a Scotch cap he had in the house, but had not worn for a long time, he appeared before the subscribing witnesses in a long night gown and with a Scotch cap on his head; that he concluded the execution of the paper by drinking hot Scotch whisky, and had what a subscribing witness calls 'a jollification;' that within four weeks after this date he began to have delusions as to his locality, and was terrified by his own imaginings, and attempted to strike the servant with a chair; that these delusions increased and his violence increased to the time of his death; that he sent for his attorney to get out a writ of *habeas corpus;* he became maniacal, and shouted and raved at least three weeks before his death so that it disturbed his neighbors in the next block; that on the second of August, 1877, he died from the disease of which he had so long been the victim; —assuming the foregoing facts to have existed, state whether, in your opinion, Mr. Fraser was of sound or unsound mind on the 17th of May, 1877, at the time of the execution of the paper sought to be proved as his will."

In answer to this question the witness testified that he should say that the decedent was not of sound mind at the date of the execution of the paper in question. A number of similar questions, not greatly different, were put to the witness and overruled by the court. Four other witnesses were called who, as medical experts, testified to the same effect with Dr. Hurd. This made five in all. A sixth was called, but the court declined to hear more.

Contestants further gave evidence tending to prove that the decedent was of unsound mind at the date of the will; that for twenty years or more he had been a victim to a painful and loathsome disease known as *lupus exedens,* commonly called cancer in the face, with no hope of relief but death; that since the fall of 1876 he had been confined to his house but not to his bed; that during the warm weather he exercised in his garden and rode out several times; that his children and grand-children were all dead; that his wife became

insane in the spring of 1877, and his own mind had begun to weaken in the memory of recent events.

Counsel for proponents, to rebut the case made by the contestants, called Dr. Peter Klein who testified that he was a physician of the city of Detroit; that he had been employed since September, 1876, by the decedent as his physician, and had attended him up to the time of his death. He was then asked: "About the last of April or first of May, 1877, what was Mr. Fraser's mental condition with reference to soundness or unsoundness of mind?" This was objected to on the ground that the proposed testimony would be in violation of professional confidence, and therefore forbidden by the statute; but the court overruled the objection, and the witness testified that he should say it was sound—perfectly sound. And the witness was allowed, under objection, to give particulars of the decedent's disease, and of his treatment of it.

Counsel for proponents then called John Pettie and examined him respecting the sanity of the decedent at the time of the execution of the will. The evidence was objected to on the ground that the proponents had declined to call him in making out their *prima facie* case; but the court received it.

The proponents then offered in evidence a letter from the decedent to the Misses Davidson, dated May 7, 1875, the purpose of which was stated to be to show friendly feelings on his part towards them. Also what purported to be a letter from Margaret Davidson in reply. The signature to the reply was not proved, but it was shown to have been found among the papers of the decedent. Both letters were objected to but received.

When the case went to the jury the contestants proposed twenty-one instructions, all of which the court rejected. These are given hereafter, pp. 236-8 *post*. The following are the instructions given:

"GENTLEMEN OF THE JURY:—You are called upon in this case to determine whether Alexander D. Fraser, on the 17th of May, 1877, possessed sufficient mental capacity to make a will.

A paper has been offered in evidence which the proponents claim to be his last will and testament. If you believe the testimony of the subscribing witnesses, the paper was executed in accordance with the laws of this State; but conceding this to be true, it is claimed on behalf of the contestants that the paper is void because Mr. Fraser, at the time of its execution, did not possess sufficient mental vigor or capacity to comprehend and realize what he was doing. This is the question of fact, or the principal question of fact, you must determine from the evidence that has been admitted. You must be careful, gentlemen of the jury, to confine your attention to the evidence introduced, and not permit your minds to be influenced by any statements made in your presence or hearing, by the counsel in this case, as to matters that were not permitted to go in evidence.

The rule, gentlemen, stated by the weight of authority, undoubtedly is that a less degree of mind is required to execute a will than a contract. Although the testator must understand substantially the nature of the act, the extent of his property, his relations to others who may or ought to be the object of his bounty, and the scope and bearing of the provisions of his will, and must have sufficiently active memory to collect in his mind, without prompting, the elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in reference to them, yet he need not have the same perfect and complete understanding and appreciation of any of these matters, in all their bearings, as a person in sound and vigorous health of body and mind would have; nor is he required to know the precise legal effect of every provision contained in his will.

To use still another form of expression, gentlemen, the will is not valid unless the person making it not only intends of his own free will to make such a disposition, but has capacity to know what he is doing, or understanding to whom he is giving his property, in what proportions, and whom he is depriving of it as his heirs or devisees under the will he makes. When a man has mind enough to know and appreciate the natural objects of his bounty, and the character and effect of the disposition of the will, then he has a mind sufficiently sound to enable him to make a valid will.

With these instructions in your mind, weigh the testimony of all the witnesses. Many of these were persons who spoke from actual knowledge of the deceased. Consider the testimony of those as well as that of the experts, and give to each and every one of them such

weight as you may deem proper. This question of capacity is entirely and exclusively for your disposition and decision.

It rests upon the proponents to satisfy you by a preponderance of proof. that the deceased was of sound mind when the paper was executed. As bearing upon the state of Mr. Fraser's mind, his declarations—that is, what he said to persons—have been admitted, and are to be construed by you for this purpose only, not as proving any facts stated in the declaration.

If, under these instructions, you reach the conclusion that A. D. Fraser possessed sufficient mental capacity on the 17th of May, 1877, to make this will, your verdict should be for the proponents. It, on the other hand, you determine he did not possess this mental capacity, your verdict should be for the contestants."

The verdict sustained the will.

The legal questions arising on this statement of facts are not numerous, and for the most part they are simple.

I. The fact that the decedent was careful in money matters, prompt and particular in the payment of debts, and that, notwithstanding this, Jennison and Pettie, two of the trustees named in the will, presented large claims against his estate for services performed for him, had nothing whatever to do with the issue being tried. The parties named were not, as claimants, in any manner interested in the will. If their claims were valid, they were equally good whether the will was sustained or defeated. Such interest as they might have as trustees had nothing to do with the claims. It is true that evidence such as was offered might raise a suspicion either that the claims were unfounded, or that Mr. Fraser in his old age had fallen into a condition that rendered him mentally dependent and helpless, but it could at best do no more than raise a suspicion, and suspicions are not evidence. If the presentation of a suspected claim could prove a decedent insane at the time of its alleged accrual, who could escape being retrospectively made a madman? But the time to expose such a claim is when it is presented for allowance, and when its validity will constitute the very question in issue.

II. If decedent expressed regret for making a gift to Mrs. Seymour, the fact might prove a change in desire, but nothing more. It had no bearing on mental capacity.

III. If the court erred in not requiring the proponents to call Mr. Pettie at the time the other subscribing witnesses were examined, the error was cured by his being called afterwards. He was put upon the stand by the proponents, and the contestants had the benefit of cross-examination. Presumptively they were not prejudiced by his not being called at first. They lost no evidence and no privilege in consequence.

FV. The ruling of the court that, on the opening for the contestants, the question of undue influence was out of the case, does not appear to have harmed them. It is not shown that during the trial they proposed by their proofs to raise that question. They did indeed offer some evidence that might have tended in that direction, but the court was not told that that was the purpose, and presumptively it was offered on the issue of sanity. Had the court been informed by counsel that through inadvertence his opening had been made less broad than was intended, and that an important branch of the proposed defense had been omitted, it is not to be doubted that liberty would unhesitatingly have been given to supply the omission. We should never consent that rules of procedure be made use of to cut off a right to full trial because of such an omission: their purpose is to further the right and aid in accomplishing justice. But the record does not inform us that in the court below any mistake or omission was pretended, and it is too late now to suggest it.

The question of undue influence being found not to be in issue, the court did not err in excluding evidence that Mrs. Seymour was kept away from the decedent, or any other evidence that only tended in the same direction.

V. The court was quite justified in declining to permit Dr. Johnson to be called as an expert by the contestants after five other experts had been called and

examined on their behalf. If testamentary cases are ever to be brought to a conclusion, there must be some limit to the reception of expert evidence, and that which was fixed in this case was quite liberal enough. To obtain such evidence is expensive, since desirable witnesses are not to be found in every community; but an army may be had if the court will consent to their examination; and if legal controversies are to be determined by the preponderance of voices, wealth, in all litigation in which expert evidence is important, may prevail almost of course. But one familiar with such litigation can but know that for the purposes of justice the examination of two conscientious and intelligent experts on a side is commonly better than to call more. And certainly when five on each side have been examined the limit of reasonable liberality has in most cases been reached. The jury cannot be aided by going farther. Little discrepancies that must be found in the testimony of those even who in the main agree, begin to attract attention and occupy the mind, until at last jurors, with their minds on unimportant variances, come to think that expert evidence, from its very uncertainty, is worthless. This is not a desirable state of things, and it can only be avoided by confining the use of expert evidence within reasonable bounds.

VI. The court did not err in permitting Dr. Klein to be examined by the proponents to show the condition of the decedent while he was treating him as a physician. The statute provides that "No person duly authorized to practice physic or surgery shall be allowed to disclose any information which he may have acquired in attending any patient in his professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon." Comp. L., § 5943. This statute, as we have held, covers information acquired by observation while the physician is in attendance upon his patient, as well as communications made by the patient

to him, *Briggs v. Briggs*, 20 Mich., 34; but the rule it establishes is one of privilege for the protection of the patient; and he may waive it if he sees fit, *Scripps v. Foster*, 41 Mich., 742; and what he may do in his lifetime, those who represent him after his death may also do for the protection of the interests they claim under him.

VII. The letters by the decedent to his brother Peter were properly excluded. The last was written more than a quarter of a century before the will was made, and Peter had been dead more than twenty years, and it appeared in evidence that family intercourse had not been kept up since. Concede that the relations were previously affectionate and brotherly, and this legal controversy is in no manner affected thereby. That he should not have kept the children of his brother in remembrance as objects of bounty, after all this lapse of time, is not so unnatural as to suggest insanity, or even the absence of ordinary affection. It was not unnatural that in his extreme old age his mind should turn more affectionately to the place of his birth, and to the relatives he had left behind him there, than to those who had passed beyond him to seek fortunes in new homes. The most that can be suggested is that the decedent discriminated in his bounty between those connected with him by ties of blood.

The letter[1] of the decedent to the Misses Davidson

[1] DETROIT, 7th May, 1875.

MY DEAR NIECES: I received your last letter in due course, and I now send you inclosed a draft for £20 sterling. I presume you have heard nothing from the         and I think you never will.

It is proper that I should mention to you that the disease that affects my nose turns out to be a cancer, and has seriously affected my right cheek. I am in the hands of the Dr., who thinks he can check its progress, but that must be difficult at my age, for you will remember I shall be 80 on the 20 of Jany. next, if I see that day. I have at already a greater age than any of my family except your mother, and my health (aside from this disease is perfectly good, altho much confined to the house in the winter, which has hardly yet disappeared. I am in the hands of that God who has often showered blessings upon me, through a long life: to His decree I bow with reverence to remove me from this scene whenever it shall be His divine will. I trust when that time comes I

might well have been kept out of the case, though we do not say it was inadmissible. It proved nothing but affectionate sentiments, and these the will proved as well. The reply,[2] purporting to be written by Margaret Davidson, was for the purposes of the case an idle document. It indicated friendly solicitude, and nothing more; and that may always be taken for granted between near relatives. The letter could in no manner have influenced the jury.

---

shall meet as a humble Christian who relies on the merits of the Savior. Let not what I have here stated give you any uneasiness. I have made abundant provision for you both as long as you live, and I have not forgotten your sister, Ann Munroe. I shall write you from time to time how I get along. My wife is in good health, and wishes to be remembered to you all. Write soon.

I am, dear nieces, yours affectionately,
A. D. FRASER.

MISS MARY and ISABELLA DAVIDSON.

P. S. Of late some of my brother Peter's children have been trying to be familiar here, altho I have known but little of them before, except Ellis, who claims to be a Dr. and seems to be an unsteady young man. The motive which led them to seek me out at this time (after the loss of all my descendants) was too plain to me and I repulsed them. They saw me with property comfortably situated in the decline of years and in delicate health, and thought now was their time. I declined to see them. Ellis treated my son before he died, in some difficulty they had so cruelly that my wife cannot bear the sight of him or to hear his name. I understand he wrote one of your family some years ago. Now it is my wish and that of my wife that neither of you ever correspond with Ellis or any of his family or with his sisters.     A. D. F.

[2] 11 HUNTLEY PLACE, INVERNESS, 2 September, 1875.

MY DEAR UNCLE: Your kind letter we received in due time, and we are glad to understand that you are again able to have your usual walks. Indeed, it is a great blessing to you that you are able to have some exercise in that way, as it will prove beneficial to your health.

I am also glad to learn from your letter that Mrs. Fraser is enjoying good health, and it affords strength to my mind and spirit to hear of you both enjoying health. Dear uncle, it gives me many a bitter thought. If you will be taken from us what will become of us, or what shall we do. You, who has acted to us as a friend, indeed as a father. Since my dear Brother Alick has been taken from us, if now that any thing will happen to you, who shall look to us and our affairs the Almighty only knows, and we trust in Him that your years may be prolonged and that He will do for you and us better than we can ask.

Dear Uncle, I hope your nose is not much pained or worse than it was. Did the Dr. do anything to prevent its progress? I shall be most anxious to hear from you soon if convenient for you.

I must now conclude by bringing you to present our kind love and our sister Annie's to Aunt Mrs. Fraser, and not forgetting (?) yourself, dear Uncle.

I remain your Affectionate Niece,
MARGARET DAVIDSON.

VIII. From the statement we have made of the facts, it is obvious that the most important questions on the trial concerned the admission of evidence to show insanity. For this purpose the contestants sought to inquire into the particulars of a disease originating twenty years before; into the behavior and habits of the decedent's son; into the relations existing between himself and collateral relatives; into the disease of a brother; into personal eccentricities, etc.; and they suggested, by the extraordinary question to Dr. Hurd, a multitude of things which, so far as this record shows, they neither proved nor offered to prove, and which, conseqently, they should not have been permitted to embrace in a question to an expert. Respecting the evidence offered and ruled out, we have been unable to satisfy ourselves that the court committed any error. Many of the facts suggested may be said to have a remote bearing upon the question of insanity to this extent: that they would be facts more likely to attend or precede a condition of insanity than one of mental soundness. But any one of those circumstances may co-exist with a perfectly sound mind, and any one of them may be looked for as not an improbable misfortune or peculiarity in the lot of a perfectly sane person.

Now that it has become so common to assail, on allegations of mental disease, the wills of those who in life, in all their business and family relations, were treated as sane, it becomes of high importance that evidence should not be received as suggesting insanity unless it has some legitimate tendency to prove it. We are persuaded that much wrong has unwittingly been done in many cases by allowing misfortunes, family calamities and personal peculiarities to go to the jury as having some necessary tendency to unsettle the mind, and therefore some bearing on the issue of mental soundness. As disturbing causes may be discovered in the family or personal history of almost every living person, the general result is that occasion is found for contesting the

validity of almost every will, especially if the estate is sufficient to tempt the endeavor. Was the decedent afflicted with a loathsome disease? Then this presumably affected his mental health. Were his ambitious hopes disappointed? Then his reason must have given way. Did a brother have fits? Then there must have been insanity in some ancestor which has tainted the brain of all descendants. Has the only son gone to ruin? Then he must have inherited mental weakness from his, father, and his bad conduct has probably reacted upon the father and disturbed his reason. Did the deceased have ways differing from most men, and rendering him eccentric? Then surely, as most men are sane, he must have been insane. Has he failed to remember some nurse or some cousin in the distribution of his bounty? Then behold, in ingratitude and want of family affection, the plain indication of mental disorder. But we need not pursue the list. Give free admission to such evidence, and no man can feel assured that the jury which examines his will in the light of his family history and personal peculiarities, will not adjudge him a madman.

We do not doubt that Dr. Hurd was correct in saying that in the diagnosis of the decedent's mental condition it would be proper to have in mind any mental disease of his brother. Very remote circumstances may properly be taken into the account by the medical examiner or expert, as affording possible clues to the real condition; but by themselves they prove nothing, and they mislead, when they come into the case as being evidence of insanity. They not only mislead, but they tend to . bring jurors and the public to a conviction that in contemplation of expert evidence one person is as sane as another, and that not even a thin appreciable partition divides reason from madness. It would be better to take away altogether the power of testamentary disposition than to have such a state of things exist; for then estates might at least be saved to relatives, which now are lost in litigation.

This case will fairly illustrate the mischiefs that might flow from such evidence. Mr. Fraser lived and was received among the people of Detroit as unquestionably a sane man. He managed with skill large interests until his physical disorder made it necessary for him to withdraw from active business life. This court may well take notice of his great legal ability and acumen, continuing so long as he remained in practice. Governor McClelland, who was at the bar with him before Michigan became a State, who was his neighbor and of whose uniform friendship he speaks in his will, detected no symptoms of mental unsoundness at the time when the will was executed. Neither did the other attesting witnesses. It is said the provisions of the will betray ingratitude and a want of natural affection: he did not remember the nurse who cared for him with a devotion so remarkable and disinterested, and he did not distribute his estate equally among his relatives. But how do these facts prove a want of testamentary capacity? He may have justly supposed that commissioners upon his estate would award to the nurse full compensation for her labors, and nothing is more unquestionable than that, by the Statute of Wills, it was intended that every man should be at liberty to select the objects of his bounty among his relatives at discretion, or even to pass them all by if so disposed. When no will is made the Statutes of Descents and Distributions regulate the division of decedent estates on the rule of equal claims, among next of kin; and if this were supposed to be the only just and proper distribution, the law would permit no other. But the right to give property by will is conferred for the very reason that the owner is supposed to be able to make, in his particular case, a better distribution of his estate than could be made by any general and unvarying rule; that he knows who by their needs, their affection, their care and solicitude for his welfare, their kind regard for himself and for those to whom he has been attached, and by the thousand other circumstances nat-

urally operating upon the mind, should be remembered in his bounty, better than any others can possibly know, and much better than any general legislation can possibly provide. *Matter of Gleespin*, 26 N. J. Eq., 523. And even when provisions appear unnatural, it can seldom be known that there were not undisclosed reasons which would fully justify what was done if we knew them.

But we cannot admit that in this case the provisions of the will have even the appearance of being unnatural. The decedent remembered first his obligations to his Maker; then his pecuniary indebtedness to the two Misses Davidson; then the kindness and attention of Mrs. Seymour; then the necessities of his countrymen in the land of their adoption; then the poor of his native parish; and then, after providing for a suitable monument for himself and for small gifts to intimate friends, he divides all the residue among near relatives, selecting as the chief beneficiaries the next of kin remaining at his old home, to which, in his declining years, his affectionate remembrances would naturally turn. If a fond remembrance of one's birth place, charity for one's needy countrymen, gratitude for kindness received, affectionate remembrance of friends, admission of pecuniary obligations, and recognition of the ties of blood are unnatural, then this will is unnatural, but not otherwise. We may regret that the decedent did not at the time remember also the family of his brother from whom he had been so long separated, but it is scarcely strange that he failed to do so. It was certainly not unnatural, for very few testators remember in their bounty all near relatives; and it is certainly none of our concern.

The practical objection to allowing the contestants to put into the case, as evidence tending to show insanity, all the facts they proposed to prove would be this, that they tended rather to put before the jury the question whether the will was a suitable and proper one, and thus led them to try the will itself rather than the testator's sanity. At best, as has been said, they did not

prove unsoundness, though they might lead it to be suspected.

If there is to be any practical and just administration of the law in will cases, such as shall protect the right of testamentary disposition, there must be some discretion in the trial court to limit the range of inquiry, especially in the examination of experts. The long question put to Dr. Hurd in this case has been characterized as extraordinary, and the justice of this must appear on the most cursory reading. It admitted of but one answer, for it embraced conditions which necessarily indicated insanity. But it also embraced many which were consistent with mental health, and one of the improprieties of the question consisted in this, that the jury might be led to infer from the general answer that each of the circumstances enumerated tended to the proof of insanity, and they might in consequence have found the existence of mental unsoundness, though they disbelieved the alleged facts which, if true, would indicate its existence. This is mentioned not because it is important on this record, but because an evident misapprehension exists regarding the province and effect of expert evidence when insanity is in question.

It is not an uncommon impression that a will must be set aside whenever the existence of any mental disorder at the time of its execution is established. *Waring v. Waring*, 6 Moore's P. C. Cas., 349. That this is not the law is apparent from the fact that the testamentary dispositions of monomaniacs are often sustained in spite of the mental disorder. When the monomania is conceded, it is only necessary to inquire further whether the provisions of the will are or are not affected by it, and the will stands or falls by that test. *Dew v. Clark*, 1 Add. Ec., 279: 3 Add. Ec., 79; *Dunham's Appeal*, 27 Conn., 192; *Lucas v. Parsons*, 24 Ga., 640; *Boardman v. Woodman*, 47 N. H., 120; *Crum v. Thornley*, 47 Ill., 192; *Thompson v. Kyner*, 65 Penn. St., 368; *Benoist v. Murrin*, 58 Mo., 307; *Banks v. Goodfellow*, L. R. 5 Q. B., 549;

*Pidcock v. Potter*, 68 Penn. St., 342. A man may believe himself to be the Supreme Ruler of the Universe, and nevertheless make a perfectly sensible disposition of his property, and the courts will sustain it when it appears that his mania did not dictate its provisions. The law refuses to aggravate the misfortune of his mania by taking from him the means of attaching others to his interests through his property, when he appears to control his property as sensibly as do his fellows. But the existence of insane delusions on one subject is much more cogent evidence of general derangement than is the fact that his father was deranged, or that a brother had delirious fits, or that a son became dissipated and went to ruin. Indeed an expert would be slow to admit that there can be a mania on one subject and a normal condition in all other particulars; and if for legal purposes we must so assume, it is evident that a state of perfect mental health cannot logically be demanded in other cases.

It may probably be assumed that medical men judge of mental disease by somewhat different standards from those applied by the public generally. The public judge from the conduct which they observe, and which seems to indicate either sense or insane delusions; but the medical expert discovers various indications of unsoundness which would escape others, and which may co-exist with careful, able and prudent management of private affairs. It is fortunate that experts have this greater ability and insight, for it enables them to prescribe for mental disease in its beginnings, and to advise the treatment of asylums before it becomes too late to arrest a growing disorder. But it would be in a high degree dangerous, as well as unjust, to deprive a man of the control of his property so soon as the indications of mental disease appear, notwithstanding he may still be managing it with propriety and judgment. For legal purposes, incapacity, either criminal or civil, must be judged of by manifestations in conduct and language.

The circumstances and symptoms in which a physician alone can perceive a tendency towards mental disorder, may aid in understanding the manifestations subsequently appearing, but they can have little further value. The expert can never be put in the place of the jury, and be allowed to decide the case on his opinion of what was naturally to be looked for in the mental history of a person shown to have had peculiar surroundings and a peculiar experience.

It is with mental health as with physical; a physician discovers evidence of actual or incipient unsoundness in numerous cases of those who pass with their fellows as persons in perfect health. For the purposes of treatment this is useful, but for the ordinary purposes of life the physician must adopt the same standard with the rest of the community, and those persons will be considered in health who pursue their ordinary avocations, and discharge the ordinary duties of life without being incommoded or inconvenienced by physical disorders. For practical purposes this is a sufficient test by which to distinguish those who are sick from those who are in health. The medical adviser needs to look further when professional objects are in view.

Under the law, no doubt, whoever may make a contract may make a will; but the manner in which will cases are treated would naturally lead to a different conclusion. If, in the case of contracts alleged to be void for want of mental capacity, the same delicate tests were applied, and the same range of inquiry permitted which have become customary in testamentary cases, no one could ever know when he would be safe in dealing with his fellows; for in business one must necessarily act upon appearances, and upon the common recognition of capacity by the community; and he cannot stop to investigate whether there was insanity in the family; or eccentricity in the conduct of the person with whom he contracts or barters, or whether there is bad behavior among his children. Commerce of all descriptions must lan-

guish if contracts were subjected to the sort of inquiries which seem to be thought proper in the case of wills. Yet in law this is as admissible in the one case as in the other, and as reasonable.   But nothing can be more illogical than the notion that a perceptible taint of insanity, not evidenced by any delusion or disorder which the public can detect, and not apparently affecting the ability to manage business concerns, shall vitiate all civil acts, even though it is conceded that an unquestionable partial insanity shall not. have the like consequence, provided the delusion is upon some subject foreign to the act done.   For our part we are not ready to assent to any rule that shall make a derangement of the faculties operate to incapacitate a person from making a valid will, when it is neither of a character to render the person incapable of acting rationally in the ordinary affairs of life, nor has it manifested itself in the testamentary provisions.   *Meeker v. Meeker*, 75 Ill., 260–266. Whatever court overturns a will ought to have reasons to stand upon which are within the grasp of the common sense of mankind.

The present case does not call for any extended examination of the general subject.   There is no doubt that the law of insanity is in danger of falling into contempt in testamentary cases as well as in criminal, and very largely because the examination of experts is conducted under an apparent belief that the slightest taint of mental disorder destroys capacity, even though the conduct has apparently never been affected by it.   No doubt this view leads to the setting aside of valid wills in some cases. It is a valuable service when a trial court keeps these investigations under the control of common sense rules. And in our view it was quite proper for the court to do what was done in this case: exclude the evidence of facts having only a remote bearing, until there had been some positive testimony to conduct evincing such mental unsoundness as would be appreciable by laymen as well as experts.   To permit the throwing of a drag-net over

the man's life and acquaintanceship, and the placing of the facts indiscriminately before the jury, is equivalent to leaving the jury to act at large in their discretion, and to lead them to reject any will that does not satisfy their judgment. Reviewing the whole record carefully, we are not satisfied that the court abused its discretion in this case.

We have already said, however, that the court erred in one instance in overruling questions because they were leading, and in another because they called for conclusions and not facts. The court also erred in holding that the questions put to Mary Colvin respecting family history, were objectionable on the ground of being hearsay. It is that sort of evidence of all others that is not objectionable on this ground. *Shields v. Boucher*, 1 De Gex & Smale, 40. But this last evidence, though not objectionable for the reason stated, might well have been rejected as immaterial.

The question now arises, whether the judgment shall be reversed for the two errors specified. In passing upon that question it is proper to take into consideration the fact that the objections which were sustained related to matters of form merely. When the rulings were made, the contestants had two courses open to them—either to avoid the objections by a change in the form of the questions, or to rely on the error in the rulings on removing the cause to the appellate court. It is scarcely necessary to say that public policy requires that the former course should be encouraged, not the latter. It is always desirable that parties so manage their cases in the trial courts as to develop the merits fully there, and so that the verdict and judgment there shall be final. And in no class of cases is this more important than in will cases.

In this case we think the contestants should have acted upon this principle. And we are not satisfied that they failed to do so, or that they lost any evidence in consequence of the rulings. The important fact they

sought to bring out was that Mr. Fraser's mind weakened in the last year of his life; and as they appear to have gone fully into the question of mental soundness, we must suppose this ground to have been covered. On the whole, we all agree that we ought not to reverse the judgment because of the rulings mentioned.

We also agree that a new trial should not be ordered because the judge refused the requests for instructions,[1] and gave a connected charge. The charge as given was fair, and sufficiently full to present all the important questions of law with which the jury had any concern. It was no doubt a more useful guide to the jury than would have been such instructions as the contestants proposed. The first five of these, so far as not objec-

---

[1] The instructions requested were as follows:

First—All persons are in law either of sound or unsound mind. If the decedent was not of sound mind, the law treats him as of unsound mind, and he is to be compared with himself and not with others in determining whether he was of unsound mind or not.

Second—That the term "sound mind," as used in the statute, stands opposed, not only to idiocy, but to all derangements of the mind occasioned by melancholy, grief, sorrow, misfortune, sickness or disease, whenever such derangement deprives one of the rational faculties common to man.

Third—If the jury find that Mr. Fraser's faculties were so far enfeebled and overcome by disease as to render him incapable of properly understanding his relations to others, their relative claims upon his bounty, the particulars of his property and the nature of the dispositions made by the will, they should give their verdict for the contestants.

Fourth—That in order to make a valid will the decedent must understand substantially the nature of the act, the extent of the property, his relations to others, who might or ought to be subjects of his bounty, and the scope and bearing of the provisions of his will, and he must have sufficient active memory to collect in his mind without prompting the elements of the business to be transacted, and to hold them in his mind a sufficient length of mind to perceive, at least, their obvious relations to each other, and be able to form some rational judgment in relation to them.

Fifth—That unsoundness of mind embraces every species of mental incapacity from raging mania to that delicate and extreme feebleness of mind which approaches nearer to and often degenerates into dementia.

Sixth—That the testator must have something more than mere passive memory. He must retain sufficient active memory to collect in his mind without prompting, the particulars of the business to be transacted, the estate which he has to dispose of, and the proper objects of his testamentary bounty.

Seventh—To make the decedent competent he must have sufficient active memory to recollect, without prompting, the elements of the business to be transacted, and to hold them in his mind a

tionable in form or in law, are given in the charge; the sixth, seventh and eighth would require caution to prevent their misleading; the ninth and tenth might be proper in a case of monomania, which was not pretended here; the eleventh, twelfth, thirteenth, twentieth and twenty-first are sufficiently covered by the charge; the fourteenth, fifteenth, sixteenth, seventeenth and eighteenth do not present questions of law; the nineteenth

---

sufficient length of time to perceive their obvious relations to each other, and to be able to form a rational judgment in regard to them, and it is not sufficient in law that he appeared to have mind enough when he made the will to answer familiar and usual questions.

Eighth—That in order to make a valid will the testator is required by law to be of sufficient capacity to exercise judgment about his property and the justice of his testamentary bounty, and he must be capable of discerning and feeling the relations and obligations of family blood.

Ninth—That a person may have upon some subjects, and even generally, mind, memory and sense sufficient to know and comprehend ordinary transactions, and yet upon the subject of the objects of his care and bounty he may be of unsound mind.

Tenth—That a person may have upon some subjects sufficient mind to know and comprehend ordinary transactions, and yet upon the subject of property which he is about to dispose of, he may be of unsound mind.

Eleventh—That the burden of proof is upon the proponents of the will to show that at the time of its execution the decedent was of sound mind.

Twelfth—That the burden of establishing testamentary capacity remains with the proponents to the end of the trial, and they must produce evidence sufficient to outweigh that which is opposed, and the whole evidence offered by either party is for the consideration of the jury.

Thirteenth—That if the jury should find that upon the other testimony relating to the testator's mental soundness the evidence was balanced, they should not allow the presumption of sanity to decide the question in the testator's favor; the burden of proof is on the proponents of the will to establish capacity by other evidence than the presumption of sanity, and that presumption cannot have the force of an independent fact to serve as a substantial make-weight against counter proof.

Fourteenth—That, as a general rule, extreme old age raises some doubt of testamentary capacity.

Fifteenth—That the loss of memory is one of the earliest and surest indications of the approach of mental infirmity.

Sixteenth—That propriety and delicacy would dictate that one interested in the provisions of the will should not conduct its making and execution; and the law requires that there should be satisfactory proof in such cases that the decedent clearly understood and freely intended to make that disposition of his property which the instrument purported to direct.

Seventeenth—That if the jury find that the will was written by one interested in its provisions, and that Mr. Fraser consulted with no other person in reference thereto, proof of the most clear and satisfactory character is required to establish the paper.

is immaterial and is also incorrect.     On the whole, we think the court in the instructions dealt with the case wisely and fairly.

We have passed over such assignments of error as seemed to us to call for no remark.   We are of opinion that the judgment under review should be affirmed.

The other Justices concurred.

---

Eighteenth—That if the jury find that the will was written by one of the trustees named therein, and that Mr. Fraser consulted with no one else in reference thereto, and at the time was enfeebled by extreme old age and a loathsome disease of long standing, the law requires that there should be proof of a clear and satisfactory character that he clearly understood and freely intended to make that disposition of his' property which the instrument purports to direct.

Nineteenth—That to make the devise to the trustees valid the jury must be satisfied of the due execution of the paper ·by testimony other than that of the two trustees who ·were subscribing witnesses; the jury must be satisfied that Mr. Fraser was of sound mind at the time of the execution thereof.

Twentieth—That in determining the question of testamentary capacity, the jury may consider the opinions of professional witnesses as inferences of fact from the evidences of physical or mental manifestations.

Twenty-first—That upon the questions relating to the mental capacity of a person to make a will, the opinions of men skilled in medical science, though not founded on their own personal observation of the facts in a particular case, are admissible in evidence; that the opinion of an expert is a fact bearing on the questions of the mental condition of the decedent, and as such its proper weight falls within the province of the jury to determine.