REZIN A. MAYNARD AND EDWIN BRADFORD, PROPONENTS OF
THE LAST WILL AND TESTAMENT OF MATTIE V. VINTON,
DECEASED, v. PORTER VINTON, CONTESTANT.

*Will—" Subscribing in the presence of the testator" defined—Husband and*
*wife—Confidential communications during marriage—Undue influ-*
*ence over a testator defined—Mental competency—Opinion*
*of physician and layman.*

1. Sec. 5789 How. Stat., requiring that all wills shall be subscribed in the presence of the testator by two or more competent witnesses, is sufficiently complied with if the condition and position of the testator, when his will is attested, with reference to the act of signing by the witnesses, and their locality when signing, is such that he has knowledge of what is going forward, and is mentally observant of the specific act in progress, and unless he is blind, the signing by the witnesses must occur where the testator, as he is circumstanced, may see them sign if he choose to do so. If, in this state of things, some change in the testator's posture is requisite to bring the action of the witnesses within the scope of his vision, and such movement is not prevented by his physical infirmity, but is caused by an indisposition or indifference on his part to take visual notice of the proceeding, the act of witnessing it, is to be considered as done in his presence, and in a case where the undisputed evidence shows this state of facts, it is error to submit the question to the jury.

If, however, the testator's ability to see the witnesses subscribe their names is dependent upon his ability to make the requisite physical movement, then if his ailment so operate upon him as to pre-

vent this movement, and on this account he does not see the witnesses· subscribe, the will is not witnessed in his presence.

2. A husband who contests the probate of his wife's will, on the ground of undue influence, should not be permitted to testify to conversations had with his wife, during marriage, of a confidential character. Such testimony is plainly incompetent, as falling within the prohibition of § 7546 How. Stat., which rests upon public policy, and the seal of secrecy which the law has fixed upon communications between husband and wife, during marriage, remains forever, unless removed by the consent of both. The death of one cannot remove it. If it could, the policy of the law would be defeated.

3. To constitute undue influence over a testator, some act or acts must have been done to cause the testator to dispose of his property contrary to his desire at the time of making and executing his will. The influence which will vitiate a will must have amounted to force and coercion, destroying the testator's free agency, and there must be proof that the will was obtained by this coercion, and that the circumstances of its execution are inconsistent with any hypothesis but undue influence, which cannot be presumed but must be proved, and in connection with the will and not with other things. Neither advice nor arguments nor persuasions will vitiate a will made freely from conviction, though such will might not have been made but for such advice or persuasion. What influence amounts to undue influence in the sense of the law cannot be defined with precision. It is a species of fraud, and like fraud, must remain undefined by the courts. All that can be done is to lay down certain general principles, and what is said above embraces those general rules which have been deduced from adjudicated cases.

4. Where no claim is made that a testator was insane, it is error to instruct the jury that "the opinions of physicians, upon questions of mental competency, are entitled to greater weight than those of ordinary laymen." The opinion of a physician as to mental competency, in such case, is entitled to no greater consideration than that of a layman, having equal facilities for observation.

5. It is error to allow a physician, in such a case, to testify that it was the duty of a physician, when called to treat a patient, to examine into his mental condition. The material fact was, what examination was in fact made, and it was for the jury to determine the relative weight to be given to the testimony of a physician and a layman.

Appeal from Kent. (Montgomery, J.) Argued November 3, 1885. Decided January 20, 1886. Reversed.

Proponents appealed from an order of the circuit court for Kent county reversing the decree of the probate court

admitting a will to probate. The facts are sufficiently stated in the opinion.

*Birney Hoyt* and *L. D. Norris*, for proponents.

*J. C. Fitz Gerald* and *N. A. Earle*, for contestant.

CHAMPLIN, J. The testatrix, Mattie V. Vinton, was the wife of Porter Vinton, the contestant of her will, and at the time of her decease they had been married some fourteen or fifteen years. At the time of their marriage Porter Vinton was a widower of some fifty years of age, with several children, all residing on his farm near Kalamazoo. The testatrix was then about eighteen years of age, and had no property, and never acquired any thereafter, except from the contestant. After the marriage, they resided on the farm some two years, and sold and removed to Alpine, Kent county, where they resided on a farm purchased by Mr. Vinton until about the year 1879, when he bought a house and lot in Sparta, in said county, and moved there, where he built a grist-mill. In the summer of 1882, he sold the mill, taking back a mortgage in the name of his wife for $3,491.23, she assigning to him $1,491.23, leaving just $2,000 of the entire amount to her. The house and lot in Sparta was also deeded to Mrs. Vinton. These transfers to Mrs. Vinton were made under an agreement between Vinton, his wife, and Walter, one of Vinton's sons, who had worked for and turned his wages into the family fund, for some years, whereby Walter was to have a deed of one-half the Alpine farm, and continue to live with and apply his wages for the benefit of the family. In consideration of the transfers above specified to Mrs. Vinton, she agreed to make her will, wherein she was to give, devise and bequeath said property, at her death, to Porter Vinton during his life, and the remainder to Walter; and, in pursuance of said agreement, and the transfers to Mrs. Vinton of said property, she, on the sixth day of October, 1882, made and executed a will giving and devising all of her estate, real and personal, to her husband, Porter Vinton, to be used and enjoyed by him during the term of his

natural life, and from and after his decease she gave the same to Walter Vinton, his heirs and assigns, forever. She appointed Porter Vinton executor of this will. Walter continued to live with the family, and give them the benefit of his earnings, except sufficient to supply himself with clothing. He was earning two dollars a day and upwards.

On the eighteenth day of August, 1883, the testatrix was taken sick with a severe attack of pneumonia, and gradually grew worse, and died on Friday, the twenty-fourth of August, at about seven o'clock in the evening. On the Monday morning after she was taken ill, being the twentieth, she sent for a neighbor, one Edwin Bradford, and desired to know if he was going to the city of Grand Rapids that week; if he was she wanted to send down by him. He told her that he did not know; that he might go down the latter part of the week. She sent for him again the next day, but he did not go to see her that day, and on Wednesday or Thursday she sent word to him again that she wanted to see him. At this interview she told him that she had made a will, and had left it with Mr. Fitz Gerald, and she wanted Mr. Bradford to go down and get that will, and told him she wanted to make a new will, and wanted him to go to Grand Rapids that morning. He told her if she wanted to make a new will it was not necessary that she should go down and take up that will; that the last will would stand anyway, and, besides, he did not see how he could get away to go. She then requested him to go and get Mr. Rezin Maynard, an attorney residing in the village, to make her will immediately. Mr. Bradford spoke to Mr. Maynard, and they came back to the sick room, and Mrs. Vinton dictated how she wished to dispose of her property. Mr. Maynard then returned to his office and drew the will, and he, together with Mr. Bradford, returned to her room, where the will was read to her by Mr. Maynard, and she said it was all right, and signed there in the presence of Mr. Bradford and Mr. Maynard, and she requested them to sign their names as witnesses. The bed was in the northwest corner of the room, with the head to the north; in the northeast corner was a bureau, upon which the will was laid

when the witnesses subscribed their names. During the time Mr. Maynard was subscribing his name as a witness, Mr. Bradford was fanning Mrs. Vinton, and from the testimony it was not entirely certain whether or not Mr. Bradford, in the act of fanning Mrs. Vinton, did not stand between her and Mr. Maynard when he was subscribing his name, so that she could not see him do it, had she looked; .otherwise she could have seen him had she been inclined to look.

By the terms of this will she bequeathed to her mother $100 a year during her natural life, a velvet chair, and a willow rocking-chair; to her sister the house and furniture in the village of Sparta, except the furniture therein otherwise bequeathed; to her niece her piano, gold watch and chain, clothing and jewelry; to John D. Miles $530, being the amount loaned to her by him. She directed $50 to be expended for a monument for herself. The balance of her estate she devised to her husband, Porter Vinton, for his use during the term of his natural life, and at his death to be divided between her mother and sister equally. She appointed Edwin Bradford and Rezin A. Maynard executors. This will was presented to the probate court of Kent county for probate by the executors therein named, when Porter Vinton appeared, and contested the same. The court, after hearing, entered an order admitting the same to probate as the last will and testament of Mattie V. Vinton, deceased, and Porter Vinton appealed to the circuit court for the following reasons, viz.:

*First*, that the said paper admitted to probate as the last will and testament of the said Mattie V. Vinton, deceased, is not the last will and testament of the said deceased.

*Second*, that the said Mattie V. Vinton, at the date of signing, sealing, and publication thereof, was not of sound and disposing mind and memory, and was incapable of making a valid will.

*Third*, that the making and execution of said paper was procured by undue influence, and the same is not the last will and testament of said deceased.

*Fourth*, that the said paper was not made nor executed as required by law.

*Fifth*, that the said paper was not witnessed nor executed as required by law.

The circuit judge charged the jury that there were three questions of fact for them to determine:

*First*, was the instrument executed with the formality required by the statute?

*Second*, was Mrs. Vinton, at the time of its execution, of sound and disposing mind?

*Third*, was any undue influence exercised over her, by means of which her free will was overcome, so that the will does not reflect in its provisions her real wishes?

Upon the first question he charged as follows:

" *First*, then, was the will duly executed? There is no dispute that the instrument was signed by Mrs. Vinton. It is claimed by the contestant that the testimony fails to show that it was attested in the presence of the testatrix by Mr. Maynard. The statute requires that all wills shall be attested and subscribed by the subscribing witnesses in the presence of the testator. It is a sufficient compliance with this provision of the statute if the instrument be signed by the subscribing witnesses where the deceased might have seen the act of signing if she chose. It must appear from the evidence, however, that, at the time of the signing by each of the witnesses, she was in a position where she might, and so circumstanced that she could, if she chose, have seen each sign his name. If she could not have seen Mr. Maynard sign his name, either by the position of Mr. Bradford, or because of her physical inability to see him—to turn her head so as to see him—the attestation would not be valid. But if she could have seen him if desired, even if some change in her position was necessary to bring Mr. Maynard within the range of her vision, if she was able to make such movement, the attestation was regular; for all the law requires is that the testatrix shall be in a position which enabled her to see the signing if desired ; and if she was in a position to see, or where she might have seen the signing, and either from indifference to the formality, or from other cause, allowed the signing to take place without observing it, this would not invalidate the act. If you find the will was legally witnessed and attested the next question is," etc.

The testimony upon which this charge was based, was given by the two subscribing witnesses to the will, who are

the executors therein named, and is as follows: Rezin A. Maynard testified:

"Then I asked her concerning the witnesses of the will, —read that clause to her,—and she requested Mr. Bradford and myself to sign as witnesses. She signed it in the bed. I held a book for her, I think. The will rested on a book, and she signed it. Mr. Bradford held her up,—supported her,—and she signed the will. Then I took the will to a bureau that stood at the head of the bed. There was a door, I think, between the bed and the bureau, and I signed it standing by the bureau, and gave Mr. Bradford the pen, and he signed it standing there. We were in her sight. She could have seen us. * * * After the will was executed, I asked her in whose custody she wished to leave it. She said she thought perhaps Mr. Bradford better take it, as he had a large safe where he could keep it, and it would be safe, and I gave it to him, and he took it."

On cross-examination he further testified:

"When the will was executed, she was lying in bed. The bed was in the northwest corner of the room; her feet were towards the south. The bureau I spoke about stood in the northeast corner of the room; I think she was not bolstered up in bed, but had one pillow under her head. * * * When she signed, I held a book in front of her as a rest, and Mr. Bradford helped raise her up, and supported her. She drew her limbs up, and Mr. Bradford supported her, and the book rested on her limbs. She was not able to raise up in bed. * * * When I signed, Mr. Bradford stood by her and near me, and between her and me. I cannot say whether he was fanning her there. I think I asked her who she wished to take the will, and I think she said that Mr. Bradford had better take it. Something was said about the safe; but whether she said it, or whether I said it, I don't know."

On redirect examination he testified:

"I suppose the will was signed the day of its date, the twenty-third day of August. Her bed stood in the northwest corner of the room; the bureau stood diagonally across the northeast corner of the room. The door was between the bureau and the bed. The whole width of the room was about twelve feet. * * * When the will was signed, I did not observe that Mrs. Vinton appeared to be drowsy or

in a stupor to any extent. I didn't notice anything of the kind."

Edwin Bradford testified:

"We were present in the room at the time of the execution of the will. Nobody else was there at that time. I think her mother went in with us, but she asked her to go out, so that we were there alone. This will was read over to her. We were all present when Mr. Maynard signed it, and when I signed it. When I signed it, I stood at the left of the bed at the bureau. Mr. Maynard stood at the bureau when he signed it. We signed it at Mrs. Vinton's request. She wanted Maynard and I to sign it as witnesses. We were all together there, in the presence of each.  *  *  *  I should say she was of sound and disposing mind and memory at that time, as far as I was able to judge"  *  *  *

On cross-examination he testified:

"I heard Mr. Maynard's description of how Mrs. Vinton lay in bed, the location of the room, bureau, etc., and that is just as I recollect it. I thought she was a very sick woman, and I didn t think she would get well. When we went to have the will executed, she was in bed, lying upon her back, —she lay upon a pillow." *Question.* "Did you observe whether she lay in a stupor or not?" *Answer.* "No, sir." *Q.* "Or whether she was pretty nearly asleep?" *A.* "No, sir." *Q.* "You didn't observe as to that?" *A.* "No, sir; I put my hand under her pillow, and kind of raised her up. I think she was not able to raise herself up. She breathed very short, and seemed awfully distressed for breath. She only answered 'yes' and 'no'—in monosyllables. After she signed I stood by the bed-side in front of her, and fanned her, or kept off the flies. After she signed the will Mr. Maynard took it, and stepped up to the bureau just to the left, and says to me, 'you will have to sign this first;' my name appearing first. I signed the will first. I laid down my fan upon the bed, and turned around to the bureau, and signed the will, and stepped right back and picked up the fan again, and Mr. Maynard signed it. I would not swear I saw Mr. Maynard sign his name. I would not wonder if I stood with my back partly to Mr. Maynard. I was keeping the flies off her. The flies were very bothersome, and would light right on her face." *Q.* "She couldn't remove them, then, herself?" *A.* "Yes, sir; and I took the fan and brushed them off. She did not seem to have the strength to remove them her-

self. I think I stood facing a little to the south with my back partly to Mr. Maynard. At that time she seemed to keep her eyes open. In the position she was there, with my fanning her, I rather think she could look through behind me, and see Mr. Maynard. I could not say for certain that she could; I did not observe her doing it. I think she was looking right up at me. To have seen Maynard she would have had to kind of turned her head and look back of me. I did not see her do that; I don't know but that she was able to do it. I would not swear she was able to do it. After the will was signed, and I let Mrs. Vinton down on the bed again, or before I went out, she said she was glad it was over; that she could take a little rest now, or something like that. * * *"

On redirect examination he further testified:

" After the will was executed, at the request of Mrs. Vinton I took it and put it in my safe. * * * When I witnessed the will, and turned around to fan Mrs. Vinton, she was conscious and sensible, and I saw no difference in her condition any time she was there. She lay in a position where she could see, if she desired to, all Mr. Maynard and myself did. There was nothing between us to hinder. All she had to do was to turn her head over and look up."

The foregoing is all the testimony there is on the record, affecting the formality or legality of the witnesses' subscribing their names in the presence of the testatrix. The facts being undisputed, and showing conclusively that the witnesses subscribed their names in the presence of the testatrix, there was nothing to be left to the jury to determine whether it was legally witnessed and attested. The statute enacts that no will made in this State, except nuncupative wills, shall be effectual to pass any estate, unless it be in writing, and signed by the testator, or by some person in his presence, or by his express direction, and attested and subscribed, in the presence of the testator, by two or more competent witnesses. What is meant by the requirement that it shall be attested and subscribed in the presence of the testator has been the subject of numerous decisions, some of which have carried the meaning of the word " presence " to a ridiculous absurdity. The object of the statute is to protect the tes-

tator against the fraud of parties witnessing the instrument, and prevent the substitution of one writing for another; and so astute have some courts been in construing the statute to prevent frauds upon the testator that they have perpetrated the most glaring frauds upon the testator by defeating his will simply because the foot-board of the bed was too high for the testator to see the witnesses sign their names at a table standing at the foot of the bed (*Newton v. Clarke*, 2 Curt. 320); or because, although the witnesses were in plain sight of the testator, yet when they signed their backs were towards him: *Graham v. Graham*, 10 Ired. 219. And courts have held that where the testator is a blind person, still the witnesses must subscribe in such position and proximity that, had the testator been possessed of eye-sight, he could have seen them; thus making the test of sight the limit of personal presence. If this is the correct criterion, then the rule, instead of being uniform, is subject to great fluctuations, according to the degree of eye-sight a person has. What would be in the presence of a far-sighted person, would be in the absence of a near-sighted one; and what would be a valid execution of a will for one, would be wholly worthless for another with equal mental capacity; and a person wearing his eye-glasses or spectacles would have a larger presence than when he laid them aside. Under such a rule, the oculist would appear to be the most important witness to establish or destroy the legal attestation and execution of a will. The statute of this State, as well as those of most other states, enacts that deeds, executed within this State, of lands, or of any interests therein, shall be executed in the presence of two witnesses, who shall subscribe their names to the same as such; yet we never have heard of any such judicial nonsense as that such deeds would be void if the witnesses, in subscribing their names, should sit with their backs to the grantor, or should not, at the time of subscribing, be within the range of his gaze. Why should not the word "presence" receive the same construction in the one case as in the other? Why should the conveyance, if by will, be void as not legally attested and subscribed, and, if by deed, executed by the

same person and under the same circumstances of mental capacity, be valid? I confess I do not see why the word "presence" should not be held to convey the idea attached to its ordinary signification in the common use of language. It is not a technical term or scientific word. Why should such a meaning be put upon this word "presence" that implies that every person who is called upon to witness the execution of a will is presumed to be willing and anxious to foist upon the testator a spurious document, and hence required to write his name under the eye (if he has one) of the testator. Such a construction must have been born of suspicion, and reared and maintained in distrust, of the morality and honesty of our fellow-beings, and I think ought to be relegated to that age of eye servants whence it originated. The common experience of mankind does not demonstrate that all men are dishonest, and watching and seeking an opportunity to perpetrate a fraud, or to take advantage of the weak and helpless. In this case it is not necessary that we should go, and I am not willing to go, any further than this Court has already gone in defining what shall be a subscribing in the presence of the testator.

In *Aikin v. Weckerly*, 19 Mich. 504, it was said:

"The condition and position of the testator, when his will is attested, and in reference to the act of signing by the witnesses, and their locality when signing, must be such that he has knowledge of what is going forward, and is mentally observant of the specific act in progress, and unless he is blind the signing by the witnesses must occur where the testator, as he is circumstanced, may see them sign if he choose to do so. If, in this state of things, some change in the testator's posture is requisite to bring the action of the witnesses within the scope of his vision, and such movement is not prevented by his physical infirmity, but is caused by an indisposition or indifference on his part to take visual notice of the proceeding, the act of witnessing it is to be considered as done in his presence. If, however, the testator's ability to see the witnesses subscribe is dependent upon his ability to make the requisite movement, then, if his ailment so operate upon him as to prevent this movement, and on this account he does not see the witness subscribe, the will is not witnessed in his presence."

The testimony is conclusive that the testatrix had knowledge of what was going forward, and was mentally observant of the specific act in progress. She had at that instant requested these two persons, who were the only ones in the room, to subscribe their names as witnesses, and immediately it was done she requested the witness Bradford to put the will in his safe for keeping. She was in a position where she could see both of the witnesses subscribe it; and that she possessed sufficient physical ability to do so, had she desired, is abundantly proved. "It was therefore enough, if the testatrix *might* see. It was not necessary that she *should* actually see the signing, because if that were the case, if a man did but turn his back, or look off, it would vitiate a will. Here the signing was within view of the testatrix; she might have seen it, and that was enough." 1 Jarm. Wills, 222 (5th Amer. ed. 87). This branch of the case should not have been submitted to the jury, for the reason that the evidence showed that the will was subscribed in the presence of the testatrix within the meaning of the statute.

Undue influence was claimed to have been exercised over the testatrix by her mother, and by one John D. Miles. The contestant, Porter Vinton, was sworn, and testified that he was the husband of the testatrix, and was examined quite fully as to the relations and feeling existing between his wife and himself from the period of their marriage which occurred in 1868, down to the time of her death; and also as to the conduct and relation which had existed between his wife and John D. Miles. He stated that she had left him on two different occasions. The first time in 1872, when she was gone three or four weeks; that all he knew about whether Miles went with her or not was what she told him the Sunday before she died. Several objections were made to the witness Porter Vinton testifying to conversations with his wife during their marriage, and a motion was made to strike the same out on the ground that the same was incompetent under the statute, and immaterial, and the said circuit judge did then and there declare his opinion that the said testimony was competent, and it did not come within the

terms of the statute in reference to the testimony of a party in a proceeding against the representative of a deceased person as to facts equally within the knowledge of the deceased, and decided that such testimony was admissible, and overruled the objection, and denied the motion. The witness Porter Vinton was then permitted to testify as follows, as coming within the ruling and decision of the court so made:

" I had a conversation with Mrs. Vinton the Sunday before she died. In the morning she told me she didn't want I should go away that day; that she wanted to see me; she wanted to talk with me. Well, along after breakfast, she came out and laid on the lounge, and said she was going to die; she said she had got a different sickness from what she ever had had, and she had a presentiment that she was going to die, and she could never meet her God unless she had a talk with me; and I told her to go on, and I would hear what she said,—I laid up nothing against her in the last twelve years at all. So she went on, and the first thing she says: ' I want you to go down to the Rapids in the morning, and get Fitz Gerald,' she says; 'I want to give Frank $500.' Frank is my oldest son. She said he had worked two years, and never had had a cent, and I told her that I would see about that. I would give Frank $500 out of the mill. Well, she wanted him to know that she gave it to him, and I coaxed her off the notion, and I told her I would see that he had it. Then she went on to tell me where she went. Frank died after she did. Then she went on to tell me where she went at the time she went off. I never had known that before,—where she went, or who went with her. I didn't know anything about it. She never would tell me. She says: ' The money I took from you Miles got; I let him have it. I met him by the river, and we went from there to Chicago; from there to St. Louis; and from there about twenty miles out to some town or village.' She said: ' We stayed there a week or two weeks, and then Miles could not get anything to do,' and she came back to her folks, and she quit him, and she came to the Bridge Street House here. That is about all. She said two or three times she let Miles have her money to come back with."

The testimony was plainly incompetent, and the court should not have permitted it to be given. The statute is explicit, that neither the husband or wife shall, during the

marriage or afterwards, without the consent of both, be examined as to any communication made by the one to the other, during the marriage : How. Stat. § 7546. This, according to the statement of the witness, was a communication of the most confidential nature made by his wife to him during the marriage, and under circumstances which brought it within the prohibition of the statute. It was one which, after her death, he could never be permitted to testify to, because it could not then be done with the consent of both. In this respect it stands on the same plane as those communications which are made to a person's confidential adviser,—an attorney, priest, or physician,—who, after the death of the party, is not permitted to disclose such communications. The privilege is the privilege of the person making the communication, and can only be waived by him personally; and the personal representative has no right to waive it, even in the interest of the estate: *Westover v. Ætna Life Ins. Co.*, 99 N. Y. 56. This statute rests upon public policy, and the seal which the law has fixed upon communications between husband and wife during marriage remains forever, unless removed by the consent of both. The death of one cannot remove the seal of secrecy. If it could, the policy of the law would be defeated. After the husband or wife has gone to the grave the survivor cannot be permitted to blacken the good name and bring disgrace upon the memory of the departed by dragging to light communications made in the confidence of the marital relation, and to protect which the statute was enacted.

The Court instructed the jury that :

"Undue influence in this case means that Mary Bowen and John D. Miles, one or both of them, had and exercised such control and direction over the judgment and will of the testatrix as to have led her to give some portion or all of her property as she did give it in this will, when, but for such influence from one of these two persons, she would not have given her property as she did give it, but would have made another and different disposition of it, or would not have disposed of it at all."

I do not think the court gave to the jury the correct rule

to guide them in the application of the law to the facts of the case. Its infirmity consists in laying down a rule quite as consistent with influence that is permissible as that which the law regards as undue, for, if any influence was exerted upon the testatrix,—by persuasion; by appeals to the affections, or ties of kindred; to sentiments of gratitude for past services, or pity for future destitution, or the like,—all of which are regarded as legitimate,—she would have been led to give some portion or all of her property as she did give it in this will, when but for such influence she would not have given her property as she did give it, but would have made another and different disposition of it or would not have disposed of it at all. The instruction does not inform the jury that, to constitute undue influence, some act or acts must have been done to cause the testatrix to dispose of her property contrary to her desire. If it was given according to her free and intelligent desire at the time of making and executing the will, although this desire was prompted by her mother or Miles, it would be a valid disposition of her property. The influence, to vitiate the will, must have been such as to amount to force and coercion, destroying her free agency, and there must be proof that the will was obtained by this coercion, and it must be shown that the circumstances of its execution are inconsistent with any hypothesis but undue influence, which cannot be presumed, but must be proved, and in connection with the will and not with other things. Neither can it be set aside on the ground of undue influence, unless such influence amounted to a degree of constraint, such as the testatrix was too weak to resist, and such as deprived her of her free agency, and prevented her from doing as she pleased with her property. Neither advice nor arguments nor persuasion will vitiate a will made freely from conviction, though such will might not have been made but for such advice or persuasion. What influence amounts to undue influence in the sense of the law cannot be defined with precision. It is a species of fraud, and, like fraud, must remain undefined by the courts. All that can be done is to lay down certain general principles, and what is said above

embraces those general rules which have been deduced from adjudicated cases. Each case must depend in a measure upon its own facts and circumstances, and a correct result can only be arrived at by the application of these general principles to the special facts and surroundings of the case.

Inasmuch as there must be a new trial, we shall express no opinion upon the hypothetical questions and expert testimony. Our previous decisions afford sufficient rules respecting such questions, and need not be repeated here. One other error needs mention. The court instructed the jury that "the opinion of physicians upon questions of mental competency is entitled to greater weight than that of ordinary laymen." This was error. There was no claim made by any one that the testatrix was insane. The questions to the physicians were addressed to their opinion of the mental capacity of the testatrix. The opinion of a physician as to mental competency, aside from the question of insanity, is entitled to no greater consideration than that of a layman having equal facilities for observation. In this connection it may be mentioned that a physician was allowed, against objection, to testify that it was the duty of a physician, when called to treat a patient, to examine into the mental condition of the patient. The effect of this testimony undoubtedly was to give to the evidence given by the physicians an undue weight with the jury. The material fact was, what examination did the physicians in fact make of the mental condition of the testatrix? And whether it was their duty to do so was unimportant and immaterial. Nor do we think that the error in the charge was cured by the court saying to the jury in that connection: "But the effect of their testimony is also a question for the jury." The weight which should be given to the testimony was for the jury, and whether the testimony of the physician upon the question of mental capacity or competency should be given greater or less weight than that of laymen upon the same question was exclusively for them to decide.

The order appealed from must be reversed, and a new trial ordered, with costs.

CAMPBELL, C. J., and MORSE, J., concurred; SHERWOOD, J., concurs in the result.