DELIA M. SPRATT ET AL., PROPONENTS AND APPELLANTS,
v. ERBERT O. SPRATT ET AL., CONTESTANTS.

*Will—Mental capacity—Evidence—Subscribing witnesses.*

1. When, in the absence of fraud or undue influence, it is shown
   that a testator either wrote or dictated the will produced, the
   *fact* is established that he was capable, mentally and physically,
   of doing whatever the instrument shows was done; and the only
   question is, does the instrument on its face indicate that it is the
   emanation of an unsound mind, when applied to the facts and
   circumstances upon which and under which it was intended to
   operate, namely, the estate disposed of, and the manner of dispo-
   sition?

2. The extent of a testator's estate, and his next of kin, and also the
   relations existing between the testator and any beneficiary under
   the will, may be shown, as bearing upon the question of mental
   capacity.

3. While it may be said that a testator's blood relations are the
   *natural* objects of his bounty, such bounty is not limited by
   blood relationship, nor have his blood relations any *natural* or
   *inherent* right to his property.

4. A testator may dispose of his property as he pleases, and it is not
   an indication of mental incapacity that he distributes it among
   certain of his relations and entirely omits others.

5. " The *right* to make a will as a testator chooses is as sacred as any
   other right, and a finding that the will is not valid, which is
   based on any other foundation than a conscientious conviction
   of *actual* incapacity, shown by the testimony, is a disgraceful
   outrage on justice, and a plain violation of the oath under
   which the conclusion is asserted." *Pierce v. Pierce,* 38 Mich.
   420.

6. Under the facts of this case (see opinion), if the testator, at the
   time he executed the will, had sufficient mental capacity to
   understand the business in which he was engaged, to know and
   understand the *extent* and *value* of his property, and *how* he
   wanted to dispose of it, and to keep *those* facts in his mind long
   enough to dictate his will without prompting from others, he had
   sufficient capacity to make a will.

7. The Court cite approvingly the following cases bearing upon the question of mental capacity: *Beaubien v. Cicotte,* 12 Mich. 490; *Aiken v. Weckerly,* 19 Id. 492; *Kempsey v McGinniss,* 21 Id. 142; *Latham v. Udell,* 38 Id. 238; *Pierce v. Pierce,* Id. 420; *Fraser v. Jennison,* 42 Id. 236; *Rice v. Rice,* 50 Id. 448; *Hoban v. Piquette,* 52 Id. 346.

8. The object of instructing the jury as to what degree of mental capacity is required in order to enable a testator to make a valid will is that the jury may take the rule of law laid down by the court, and apply it to the facts as proved by the testimony, and ascertain whether the testator possessed that degree of mental capacity required by the rule.

9. When no question of fraud or undue influence is involved, but the question is one solely of mental capacity, and it appears that the testator wrote or dictated the will without being prompted, which is intelligible and consistent in its provisions, and disposes of *all* the testator's property, and there is nothing upon its face to indicate mental unsoundness, *such* facts make a very strong case in favor of mental capacity.

10. Where each of the witnesses to a will testifies that they were all present, and saw the testator sign the will, and that he was sitting in a chair at the time, and that they each subscribed it as witnesses in his presence, and there is no testimony that he did not see such signing, or that he was in a position where he could not see or did not see it, the uncontradicted testimony shows a due execution of the will in the presence of the witnesses, and that they signed it in the presence of the testator.

11. The fact that witnesses testify that during the time a will was being drawn the testator sat in a chair, and most of the time with his head resting upon the back of a chair in front of him, and that he was drowsy, has no tendency to prove that he was in *that* position when the witnesses subscribed the will.

12. As to what is a signing in the presence of a testator, see *Maynard v. Vinton,* 59 Mich. 139.

Error to Jackson. (Peck, J.) Argued July 11, 1889 Decided October 11, 1889.

Proponents appealed from the order of the probate court disallowing a will, which was affirmed in the circuit court. Order set aside and new trial granted. The facts, and points of counsel *passed* upon by the Court, are stated in the opinion.

*Blair, Wilson & Blair* and *Thomas A. Wilson,* for pro-
ponents and appellants.

*Hammond, Barkworth & Cobb* and *Gibson & Parkinson,*
for contestants.

CHAMPLIN, J.  Albert L. Spratt was a farmer, unmar-
ried, and at the time of his death was 71 years of age.  He
died November 19, 1886, of pneumonia, having made the will
in question on the sixteenth of the same month.  At the
time of his death he had accumulated property which inven-
toried about $123,878, consisting of farms, bonds and mort-
gages, notes, and other personal property.  He had resided
on a farm in the town of Spring Arbor, Jackson county,
Michigan, nearly all his life, with a maiden sister, who, at
the time of his death, was 67 years of age, named Delia M.
Spratt.  His parents were dead, and he left no issue surviv-
ing him.  Had he died intestate his property would have
descended, under subdivision 3, § 1, chap. 219, How. Stat., to
Delia M. Spratt and Almira M. French, two sisters who
were living, and to the children of three deceased brothers.

Aside from $2,000 to build a monument, and $2,000 given
to his brother-in-law, he made specific bequests in property
and money to his sisters, and to the descendants of his broth-
ers and sister to the number of 16, whom he mentioned by
name, extending his bounty to grand-nephews and grand-
nieces.

The doctor was first called to attend the testator in his last
sickness on the tenth of November.  On Monday, the fif-
teenth, the attending physician informed Mr. Spratt that his
disease would probably terminate fatally, and asked him if
there· was any business that he would like to do, and he
replied: " Why, yes; I want to make my will."  On that
evening Mr. Spratt requested his nephew, William H. Spratt,
to go in the morning for some one whose name he did not

understand.    In the morning Mr. Spratt requested this
nephew to get Mr. Darling, and he did so.    Darling was a
justice of the peace, and lived about three miles distant.

When he arrived Mr. Spratt requested him to draw his
will.   He began preparations between 8 and 9 o'clock, and
it was completed about 3 o'clock in the afternoon.    During
the time there was an interval of about an hour while parties
were looking over notes at the request of Mr. Spratt to ascer-
tain their amount, and another interval of about an hour for
dinner, during which time nothing was done by Mr. Darling
in writing the will.    The will was dictated by Mr. Spratt, and
written down by Mr. Darling from such dictation, and, while
doing so, Mr. Spratt sat most of the time in a chair, leaning
forward, and supporting his head upon the back of another
chair in front of him.    He was afflicted with a "harelip,"
which affected his enunciation, and rendered it difficult for
those not familiar with his speech to understand him.

William H. Spratt remained in the room during the prep-
aration of the will at Mr. Spratt's request, and at times,
when Mr. Darling did not understand distinctly what was
said, repeated what Mr. Spratt had said.    The remedy admin-
istered by the attending physician was quinine and whisky
and ammonia.    During the day when the will was being
drawn, the doctor testified to administering three doses, and
Mrs. Amy Spratt testifies to administering one dose.    The
medicine was given from a spoon, but whether a tea-spoon
or a table-spoon full was a dose does not appear from the
record.

The story told by the physician who attended Mr. Spratt
in his last sickness is singularly inconsistent.    He testified,
when first upon the witness stand, that on the day the will
was made he administered three doses of medicine to Mr.
Spratt during the forenoon; that he first saw him that
morning, when he first returned to the house, about 11
o'clock in the forenoon, and again at the time of the execu-

tion of the will; and that his condition then was about the same it was when he first saw him in the forenoon. Later on he testified that he gave Mr. Spratt a remedy the first time he went into the room that day, consisting of whisky, quinine, and carbonate of ammonia, which was the remedy he had been giving him all along.

In another place in the record he testified that he was only in the room three or four times that day previous to the time the will was signed; that he went there in the morning and went away again; that he came back in the afternoon; that he was not aware that any will was being drawn until the afternoon; that he was not called in as a witness to the will, but happened to call on his patient at the time it was being executed; that in the opinion of the witness he talked with the testator enough on that day to form an opinion as to his mental condition, and that in the opinion of the witness he regarded him as being flighty some of the time, but most of the time sane and rational.

He was recalled later, and cross-examined by counsel for contestants, and testified that during the time they were drawing the will he went to sleep in an adjoining room; that he woke up but once before getting up, when William Spratt came to him and stated that dinner was ready, and that he replied that he preferred to sleep, and didn't want any dinner; that the next time he awoke he heard some one, but who he could not say, make the remark,—

" What are you going to do with the rest? There is some other things."

That he did not hear the answer, and did not hear what property they were talking about. He also testified, in answer to interrogatories put by contestants' counsel, that he was of the opinion that the *physical* condition of the testator on the day the will was made was such that he could not have been able to carry in his mind any lengthy statement of facts, owing to the effects the disease had had upon his physical

system; that he examined the testator several times after he returned to the house, and while the will was being made, and was of the op, nion that he was rapidly approaching dissolution, and that he gave him stimulants to keep him up. He also testified that there had been some difficulty all along in making him hear that he was to take some medicine; that there was no more difficulty in that regard on this occasion than on any other; that when he was made to hear he comprehended what was said.

The testimony of this witness shows of what little value is opinion evidence. In his opinion the testator was a little flighty, but most of time was sane and rational. The only facts upon which he based his opinion that he was at times a little flighty were that the evening before the will was drawn, when he told him he could not recover, Mr. Spratt blamed him for not telling him before, and asserted that he had promised to give him three days' notice, and had not done so, which the witness says was not true. He also blamed the doctor to a Mr. Dean, and said he had promised to give him three days' notice. But the facts show that the doctor had then been attending him for four days, and that he regarded his illness very serious from the first.

Another fact upon which he bases that opinion is that after the will was executed the testator wanted to put on his boots and walk outdoors, and said that he thought it would do him good; and the third fact was that the testator muttered to himself a good deal.

It is difficult to see anything in these facts to indicate that the testator was flighty. A sane and rational man may take issue with his physician with respect to the fact whether the physician had been derelict in not informing him of the serious nature of his malady, especially when his estate was large, and he wished to dispose of it by will. He might also be of opinion that outdoor air would do him good, especially when he was able to sit up, and, with assistance, walk from

the bed to his chair. The mutterings of a man afflicted with pneumonia may be as well attributed to physical pain and suffering as to a disordered mind. The opinion expressed as to his incapacity to make a will, owing to his physical condition, is based upon examinations which he made that day, from which he formed the opinion that he was rapidly approaching dissolution. The facts appear, however, that this was on the fifteenth, and he did not die until the nineteenth, and that he was able to sit up the most of the time during the day.

But what weight is opinion evidence entitled to where it appears that, unaided by any one, he does in fact make a will disposing of all his property, dictating consecutively the bequests and devises he sees fit to make to a large number of relatives, near and remote? What weight or reliance should be given to the opinion of persons, interested or disinterested, professional or lay, to the effect that a person, who has in fact dictated a will disposing of all his property by successive bequests and devises, requiring consecutive thought and the exercise of memory, was unable to transact any matter of business which required for its completion several hours of time, recalling of various people and facts, or that he was mentally incapacitated to understand the nature and extent of his property, and the number and relation of those who were the proper objects of his bounty, so as to make a will devising his estate? The court rightly instructed the jury that there was no claim in the case that there was any fraud or undue influence practiced upon the testator in making the instrument; and he also instructed them that, beyond the questions incident to its execution, the only question was whether, at the time the will was executed by Mr. Spratt, he was competent to make it,—whether he was of sound mind.

Now when, in the absence of fraud or undue influence, it is shown that the testator either wrote or dictated the will

produced, the fact is established that he was capable, mentally and physically, of doing whatever the instrument shows was done; and the only question is, does the instrument on its face indicate that it is the emanation of an unsound mind, when applied to the facts and circumstances upon which, and under which, it was intended to operate, namely, the estate disposed of, and the manner of disposition?

The extent of his estate, and his next of kin, and also the relations existing between the testator and any beneficiary under the will, may be shown, as bearing upon the question of mental capacity; and, while it may be said that a testator's blood relations are the natural objects of his bounty, his bounty is not limited by blood relationship, nor have his blood relations any natural or inherent right to his property. He may dispose of his property as he pleases, and it is not an indication of mental incapacity that he distributes it among certain of his relations and entirely omits others.

After carefully reading the testimony in this case, we feel justified in repeating what was said in the case of *Pierce v. Pierce,* 38 Mich. 420, viz.:

" We referred in *Latham v. Udell* [38 Mich. 238], and we think it not improper to refer again, to the wrongs done under color of law by the attempts, which are becoming so common as to be dangerous to the security of private property, to overthrow wills because they do not suit the notions of those who determine their validity. The right to make a will as a testator chooses is as sacred as any other right, and a finding that the will is not valid, which is based on any other foundation than a conscientious conviction of actual incapacity, shown by the testimony, is a disgraceful outrage upon justice, and a plain violation of the oath under which the conclusion is asserted.''

It is the duty of the court to instruct the jury in plain terms what is meant by testamentary capacity.

Under the facts of this case the law upon this question is embraced in a small compass. If, at the time he executed the will, the testator had sufficient mental capacity to under-

stand the business in which he was engaged, to know and understand the extent and value of his property, and how he wanted to dispose of it, and to keep those facts in his mind long enough to dictate his will without prompting from others, he had sufficient capacity to make a will.

The circuit judge substantially charged this; but, to fix in their minds what he considered the governing principle applicable to the case in this respect, he amplified the subject considerably, and in some respects very much qualified what he had previously said upon the subject, and applied much severer tests to testamentary capacity. He charged the jury, and, among other instructions, said:

"Average mental capacity at the time of the execution is not necessary to the validity of a will. A less degree of mind or capacity is requisite to execute a will than a contract, and though the testator must understand substantially the extent of his property, his relations to others who may or ought to be objects of his bounty, and the scope and bearing of the provisions of his will, and must have sufficient activity of memory to collect in his mind, without prompting, the elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive as well their obvious relations to each other, and be able to form some rational judgment in relation to them, yet he need not have the same perfect and complete understanding and appreciation of any of these matters, in all their bearings, as a person in sound and vigorous health of body and mind would have. Nor is he required to know the precise legal effect of every provision contained in his will."

He further charged the jury upon this subject as follows:

"The law, gentlemen, does not require property to be disposed of equally among those who would be heirs in case of a person's death, but leaves every one who has a sound mind to dispose of his property as he chooses; and the fact that he preferred one to another can have no bearing on the validity of his voluntary and intelligent action. It concerns no one what his reasons may be for doing what he has a right to do. Courts and juries have no right to substitute their judgment for his, or to determine upon the wisdom or justice of his reasons. Whether they are wise or unwise, just or unjust,

they are for him, and for no one else, to determine; assuming that when he executes a will he is of sound mind, and the will is in proper form.

"Now, soundness of mind, gentlemen, implies such a mental condition as enables the testator to understand and comprehend his act, and all the conditions which would enter into its rational performance.

" It is not enough that he understands some of these, or some part of them, or that he could form some rational idea upon a branch of the subject, but he must have mind enough to comprehend and understand the scheme—the general plan —of the entire transaction.    He need not be able at the moment to carry in his mind the details of his estate in a case like this, where the estate is large, but he must have a general comprehension of it, of what he is doing, of the effect of the will he is making, and must at the same time be able to understand who, among those who are the natural objects of his bounty, he is excluding from participation therein.

" Now, in order to sustain the will offered to you here, you must find that the testator knew and understood the extent and character of his property; the number and condition of his relatives, and their relative claims upon his bounty; to whom he was giving his property, and in what proportions; whom he is cutting off from it who would otherwise have inherited it, and the reason for giving or withholding his bounty as to any and every of them; and he must have been capable of continuous, consecutive thought so as to enable him to retain the provisions of the instrument in his mind during the time of its preparation, and to perceive their relations to each other and to the whole subject."

A large portion of the language contained in these instructions have received the sanction of this Court in *Aikin v. Weckerly*, 19 Mich. 492, 506 ; *Kempsey v. McGinniss*, 21 Id. 142 ; *Fraser v. Jennison*, 42 Id. 236 (3 N. W. Rep. 882) ; and *Beaubien v. Cicotte*, 12 Id. 490.

In *Beaubien v. Cicotte*, speaking of the capacity which a testator should possess to make a valid will, this Court said :

" It cannot be claimed that a will is valid unless the testator not only intends, of his own free will, to make such a disposition, but is capable of knowing what he is doing, of understanding to whom he gives his property, and in what

proportions, and whom he is depriving of it as heirs or devisees under the will he revokes."

In *Aikin v. Weckerly* (p. 492) this Court held the following charge to state the law correctly, viz.:

"To make the testator competent he must have sufficient active memory to recollect in his mind, without prompting, the elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive their obvious relations to each other, and to be able to form a rational judgment in regard to them; and that it is not sufficient in law that the testator be of memory, when he makes his will, to answer familiar and usual questions."

In *Kempsey v. McGinniss,* 21 Mich. 141, 142, it was said that—

"The rule settled by the weight of authority undoubtedly is that a less degree of mind is requisite to execute a will than a contract; and though the testator must understand substantially the nature of the act, the extent of his property, his relations to others who might or ought to be objects of his bounty, and the scope and bearing of the provisions of his will, and must have sufficient active memory to collect in his mind, without prompting, the elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them,    *    *    *    yet it is quite clear, from the great weight of authority, that he need not have the same perfect and complete understanding and appreciation of any of these matters, in all their bearings, as a person in sound and vigorous health of body and mind would have, nor is he required to know the precise legal effect of every provision contained in his will; for upon this even the draughtsman of the will, though competent, and in full possession of all his faculties, may often fail, and even the best lawyers may not be able to pronounce with certainty until the question is settled by judicial authority."

In *Fraser v. Jennison,* 42 Mich. 221, the circuit court embodied in his instructions what has been above quoted from *Kempsey v. McGinniss* and *Beaubien v. Cicotte,* and added:

" When a man has mind enough to know and appreciate the natural objects of his bounty, and the character and effect of the disposition of the will, then he has mind sufficiently sound to enable him to make a valid will;"—

And this Court approved of the instructions so given.

Comparing the degree of legal capacity required to make a valid will, above laid down, with that required by the learned judge in this case, it will be seen that the rule laid down by him required a higher degree of mental capacity than has heretofore been laid down by this Court.

It is not required that a testator should know and understand the number and condition of his relatives, nor their relative claims upon his bounty, nor that he should know and understand the reason for giving or withholding his bounty as to any and every relative.

The object of instructing the jury as to what degree of mental capacity is required in order to enable a testator to make a valid will is that the jury may take the rule of law laid down by the court, and apply the facts as proved by the testimony, and ascertain whether Mr. Spratt possessed that degree of mental capacity required by the rule.   And under the instructions given they would inquire:

" Did Mr. Spratt know and understand the number and condition of his relatives?

" Did he know and understand their relative claims upon his bounty?

" Did he know and understand the reason for giving to those he did give to, and the reason why he did not give to two of his nieces?"

These questions are too remote and conjectural to be applied as tests of mental capacity.

The rule as laid down by this Court is sufficiently stringent for all practical purposes, and needs to be applied to particular cases with some degree of care.   To lay down such rule to a jury in abstract terms, without instructions as to its application to the case in hand, would be, in effect, to over-

throw nearly every will that is contested. This Court has had occasion to advert to this subject before. *Fraser v. Jennison*, 42 Mich. 227 *et seq* (3 N. W. Rep. 882); *Rice v. Rice*, 50 Id. 448 (15 N. W. Rep. 545); *Pierce v. Pierce*, 38 Id. 420; *Hoban v. Piquette*, 52 Id. 346 (17 N. W. Rep. 797).

The testimony in this case shows that Mr. Spratt commenced life a poor boy, and by industry, economy, and business tact amassed a fortune. It had never been supposed, down to the time of his last illness, that he was not capable of making valid contracts. He had formulated and signed a will in 1872, but the same was not witnessed nor published, in which he made Delia M. Spratt his residuary legatee. He also gave specific legacies to several of his relatives, all of whom are legatees named in the will in contest here; and it is worthy of note that the two nieces who were not mentioned in the last will are also omitted in the draft made by him in 1872.

There is no claim made, and no testimony showing, that any undue influence was exerted upon him at the time or before he made his will, and but two questions were presented to the jury by the court, viz., the due execution of the will, and the mental capacity of the testator. He dictated the provisions of his will to a justice of the peace, who seems to have written down quite literally, and who failed to put the formal conclusion to it. There is nothing complex about the will. He makes certain specific legacies to certain specified persons, and in two or three instances increases them before he devises the residuary; but he states that he gives them in addition to what he had before given, showing that he had sufficient active memory to collect and retain in his mind the elements of the business he was transacting, and to perceive their obvious relation to each other Looking upon the transaction as a whole, and testing it by the rules laid down by this Court, it is difficult to perceive wherein he lacked that degree of mental capacity required to the execution of a valid will.

Judge CHRISTIANCY, in *Kempsey v. McGinniss*, 21 Mich. 141, says:

"But what degree of mental capacity is necessary to enable a testator to make a valid will; to what extent, and to what degree of perfection, he must understand the will, and the persons and property affected by it; or to what extent his mind must be impaired to render him incapable,—is a question of law exclusively for the court, and with which the witnesses have nothing to do."

When no question of fraud or of undue influence is involved, but the question is one solely of mental capacity, and the fact is shown that the testator wrote or dictated the will without being prompted, and the will itself is intelligible and consistent in its provisions, and disposes of all the testator's property, and there is nothing upon the face of it to indicate mental unsoundness, the testimony as to mental incapacity would have to be very strong and convincing to defeat such will. I do not mean to say that more than a preponderance would be required, but that the facts suggested make a very strong case in favor of mental capacity.

The court charged the jury that the attestation of the will in the presence of the testator by two or more subscribing witnesses presented one of the principal points of contention in the case. This portion of his charge was as follows:

"Now it is not disputed that three competent persons signed the will as witnesses soon after seeing the deceased, Albert Spratt, sign it. The physical act of signing by the witnesses is not disputed, but it is contended by the contestants that such signing, under the circumstances and conditions shown by the evidence to have attended and surrounded Mr. Spratt at the time the same was done, cannot be said to have been an attestation and subscription by the witnesses in the presence of the testator, within the meaning of that expression as used in the statute.

"Now, gentlemen, as affecting this question, and to enable you to apply properly the law to the evidence in the case, I instruct you with reference to this subject of the signing in the presence of the testator in the following language:

" 'The condition and position of Mr. Spratt when the witnesses attested and subscribed the will must have been such, and the position and locality of the witnesses themselves when in the act of signing must have been such, that Mr. Spratt had knowledge of what was going forward, and was mentally observant of the specific acts in progress; and the signing by the witnesses must have occurred where, and under such circumstances, that Mr. Spratt might have seen them sign it if he had chosen so to do. If in this state of things some change in Mr. Spratt's position was requisite to bring the action of the witnesses while signing within his scope of vision, and such a change or move was not prevented by Mr. Spratt's physical infirmities, but was caused by an indisposition or indifference on his part to take visual notice of the proceedings, the act of the witnesses should be considered by you as done in his presence.

" 'If, however, Mr. Spratt's ability to see the witnesses subscribe depended upon his ability to make the requisite movement or change in his position, then if his ailment or sickness so operated upon him as to prevent this movement,—to prevent his making the necessary movement necessary to his visual notice, if he had chosen to,—and on this account he did not see the witnesses subscribe, then the will was not witnessed in his presence.

" 'If the witnesses, when they subscribed the will, were where Mr. Spratt could have seen them do it by some slight movement of his head,—as by raising up his head, and opening his eyes,—and he was at that time able to raise his head and open his eyes, but did not do so because he had no desire to see it, and was careless and indifferent about it, the signing by the witnesses was in Mr. Spratt's presence.' "

Each of the witnesses to the will testified that they were all present, and saw the testator sign the will; that he was sitting in a chair at the time; and that they each subscribed it as witnesses in the presence of the testator. There was no testimony that the testator did not see each witness subscribe his name as a witness, or that he was in a position where he could not see or did not see them do so; and the contention upon that point, and the charge, raised a false issue which must have misled the jury into rendering the verdict they did. It was error to submit questions of fact

to the jury as controverted, about which there was no contradictory testimony. The uncontradicted testimony showed a due execution of the will in the presence of the witnesses, and that they signed it as such in the presence of the testator. The fact that witnesses testified that during the time the will was being drawn the testator sat in a chair, and most of the time with his head resting upon the back of a chair in front of him, and that he was drowsy, had no tendency to prove that he was in that position when the witnesses subscribed the will.

As to what is a signing in the presence of a testator, see *Maynard v. Vinton,* 59 Mich. 139 (26 N. W. Rep. 401).

The order of the circuit court disallowing the will must be set aside, and a new trial ordered.

The proponents will recover costs of this Court.

MORSE and LONG, JJ., concurred with CHAMPLIN, J.

SHERWOOD, C. J.   I concur in the result.

CAMPBELL, J., did not sit.