SPENCER v. TERRY'S ESTATE.[1]

1. WILLS—COMPETENCY OF TESTATRIX—INSTRUCTIONS.
    Where, on a will contest, proponent requested an instruction that if the testatrix made a draft of her will in her own handwriting, and at the time knew what she was doing, and recalled to her mind her property and her friends and relatives, and gave it to her attorney, and directed him to add a clause disposing of the residue to a library association, then the jury should sustain the will; and there was testimony to support the request,— it was error to modify it by inserting the words, "if she was then competent."

[1] Rehearing denied July 19, 1901.

2. Same—Application of Testimony.

> Where there was much in the testimony of contestant's witnesses to show that the testatrix was competent when she executed her will, and all of their testimony was not necessarily inconsistent with that of proponent's witnesses, it was error for the court to array the witnesses of the respective parties against each other in his charge to the jury.

Error to Berrien; Coolidge, J. Submitted February 14, 1901. Decided July 10, 1901.

George F. Sonner presented for probate the last will and testament of Melissa E. Terry, deceased. The will was allowed, and Charles A. Spencer and others appealed to the circuit court. From a judgment for contestants, proponent brings error. Reversed.

*A. P. Cady* and *I. W. Riford*, for appellant.

*Gore & Harvey*, for appellees.

Hooker, J. The controversy in the present case arises over the will of Melissa E. Terry, who died, a childless widow, at the age of 70 years, at Benton Harbor, Mich. The index does not refer to the verdict and judgment, if they are contained in the record, but the briefs lead us to infer that a successful contest was made by the appellees, and the will was held to be void on the ground of a want of testamentary capacity.

The will was drawn by her attorney, named Plummer, and was formally executed. The following is a copy:

"In the name of the Father, the Son, and the Holy Ghost, I hereby make my last will and testament. To God, its Creator, I intrust my soul. To its returning dust I resign my body, and it is my wish that it be laid beside my husband in the family lot at Elmwood Cemetery, Detroit, Mich., as indicated on the map within which is the deed of ownership; said map and deed to be submitted to the care of F. S. Hendrickson, my nephew, who will accompany the remains to their last resting place. When funeral rites are over, and all expenses settled, including doctors, undertakers, and other incidental, I next bequeath

to my brother, Charles A. Spencer, and my sisters, Romelia M. Hendrickson, of 3101 Groveland Ave., Chicago, Ill., and Mary S. Johnson, of 4725 Langley Ave., Chicago, Ill., such part of my estate as I received from my father's estate at the time of his death, namely, a thousand and fifty dollars, to be equally divided between them. I next bequeath to Elmwood Cemetery the sum of two hundred dollars, to be kept at interest as a perpetual fund for keeping the lot in good condition. I also bequeath to Mary L. Whipple, of Grand Rapids, Michigan, a protégé of mine since her mother's death, when she was but eight years of age, the house and lot in Berrien Springs once the property of Mrs. Francis Smith, but which came to me through foreclosure of mortgage.

"All the balance of my estate, of whatever kind, I give and bequeath to the Benton Harbor Library Association, to have and to hold forever."

The undisputed testimony shows that on the 17th day of February she sent a note to Plummer, requesting him to call at her residence, and he did so. She gave him a memorandum in her own handwriting, and requested him to put it in shape for her will. The will drawn is a literal copy of the memorandum, except the last paragraph, which was not contained in the memorandum. The witness testified that, after reading the memorandum, he asked her what she wanted to do with the balance of her property, and said, " 'You have only disposed of part of it.' She said, 'I have had two objects in view.' One was to give it to a small church, as I remember it,—I thought she said South Haven; I didn't charge my mind with it,— and the Benton Harbor Library Association. Then she said, 'As I have worked for the church all my life, the church wouldn't find fault with me;' and she concluded to give it to the Benton Harbor Library Association." The will was read to Mrs. Terry, and she signed it. At that time the library association was organized, but had not yet a library, having been organized but a short time. The will was witnessed by a Mrs. Gurd, who occupied a portion of the house of Mrs. Terry, and was called in for the purpose.

The brief of the contestants places the contest upon the ground of mental incompetency, and we need not consider the question of undue influence, of which there is not a shadow in the proofs.    The testatrix was taken ill in December.    She made her will on February 17th, following, and died on March 26th.    Her physician, Dr. Bell, testified that he was first called in December, and made a few visits that month, and was next called in January 31st, and thereafter attended her at intervals of a few days, and sometimes on successive days.    He says that at his first visit she had chills and fever, heart trouble, and a dropsical condition of the system; also a slight kidney trouble; that at times she showed considerable mental derangement. He did not notice any particular trouble with her mental condition during the fore part of her illness, but about the 19th of February, one evening, she was excited and irrational, and from that time she was deranged to a certain extent, and, in his opinion, she was not competent to make the will.    Mrs. Gurd, a woman who occupied a portion of Mrs. Terry's house, and saw much of her; Mrs. Getchell, an acquaintance for six years; Mrs. Keith, a near neighbor; Mrs. Woodruff, the wife of a clergyman, and an intimate friend of the testatrix; Miss Deam, a school teacher, and an intimate friend of long standing; and Mrs. Faulkingham, who was much with testatrix in church work,—all testified that, in their opinions, she was incompetent to make this will.    There were others who gave similar testimony.    There was testimony tending to show that the testatrix was not in her usually strong mental condition when she was sick, and that at times she was incoherent and rambling.    On the other hand, the inference is strong that she was not at all times irrational, and the uncontradicted testimony of Plummer is very convincing.

Whatever witnesses may think of her condition as a rule, it is impossible to read this record impartially without believing that the making of a will had been on her mind for some time; that on the 17th day of February she sent for her attorney, and gave him the written memorandum, which some of the contestants' witnesses testify

was in accord with her previously-expressed intentions, and which was on that day, or some other day, prepared by her, and which, in and of itself, tends strongly to show that she was not incompetent when it was prepared. She accompanied it with a suggestion as to the balance of her property which is not in itself unreasonable.

It has been said that when the undisputed proof shows that the testator could and did write or dictate the will produced, in the absence of fraud or undue influence, "the fact is established that he was capable, mentally and physically, of doing whatever the instrument shows was done; and the only question is, Does the instrument, on its face, indicate that it is the emanation of an unsound mind, when applied to the facts and circumstances upon which and under which it was intended to operate, namely, the estate disposed of, and the manner of disposition?" *Spratt* v. *Spratt*, 76 Mich. 391 (43 N. W. 629). Also:

" The extent of his estate, and his next of kin, and also the relations existing between the testator and any beneficiary under the will, may be shown, as bearing upon the question of mental capacity; and, while it may be said that a testator's blood relations are the natural objects of his bounty, his bounty is not limited by blood relationship, nor have his blood relations any natural or inherent right to his property. He may dispose of his property as he pleases, and it is not an indication of mental incapacity that he distributes it among certain of his relations, and entirely omits others.

" After carefully reading the testimony in this case, we feel justified in repeating what was said in the case of *Pierce* v. *Pierce*, 38 Mich. 420, viz.:

" ' We referred in *Latham* v. *Udell*, 38 Mich. 238, and we think it not improper to refer again, to the wrongs done under color of law by.the attempts, which are becoming so common as to be dangerous to the security of private property, to overthrow wills because they do not suit the notions of those who determine their validity. The right to make a will as a testator chooses is as sacred as any other right, and a finding that the will is not valid, which is based on any other foundation than a conscientious conviction of actual incapacity, shown by the testimony, is a disgraceful outrage upon justice, and a plain violation of the oath under which the conclusion is asserted.'

" It is the duty of the court to instruct the jury in plain terms what is meant by ' testamentary capacity.'

" Under the facts of this case, the law upon this question is embraced in a small compass.   If, at the time he executed the will, the testator had sufficient mental capacity to understand the business in which he was engaged, to know and understand the extent and value of his property, and how he wanted to dispose of it, and to keep those facts in his mind long enough to dictate his will without prompting from others, he had sufficient capacity to make a will."

Speaking further in the same case the distinguished jurist said:

" The testimony in this case shows that Mr. Spratt commenced life a poor boy, and, by industry, economy, and business tact, amassed a fortune.   It had never been supposed, down to the time of his last illness, that he was not capable of making valid contracts.   He had formulated and signed a will in 1872, but the same was not witnessed nor published, in which he made Delia M. Spratt his residuary legatee.   He also gave specific legacies to several of his relatives, all of whom are legatees named in the will in contest here; and it is worthy of note that the two nieces who were not mentioned in the last will are also omitted in the draft made by him in 1872.

" There is no claim made, and no testimony showing, that any undue influence was exerted upon him at the time or before he made his will, and but two questions were presented to the jury by the court, viz., the due execution of the will, and the mental capacity of the testator.   He dictated the provisions of his will to a justice of the peace, who seems to have written down quite literally, and who failed to put the formal conclusion to it.   There is nothing complex about the will.   He makes certain specific legacies to certain specified persons, and in two or three instances increases them before he devises the residuary; but he states that he gives them in addition to what he had before given, showing that he had sufficient active memory to collect and retain in his mind the elements of the business he was transacting, and to perceive their obvious relation to each other.   Looking upon the transaction as a whole, and testing it by the rules laid down by this court, it is difficult to perceive wherein he lacked that degree of mental capacity required to the execution of a valid will.

"Judge CHRISTIANCY, in *Kempsey* v. *McGinniss*, 21 Mich. 141, says:

" 'But what degree of mental capacity is necessary to enable a testator to make a valid will; to what extent, and with what degree of perfection, he must understand the will, and the persons and property affected by it; or to what extent his mind must be impaired to render him incapable,—is a question of law exclusively for the court, and with which the witnesses have nothing to do.'

" "When no question of fraud or of undue influence is involved, but the question is one solely of mental capacity, and the fact is shown that the testator wrote or dictated the will without being prompted, and the will itself is intelligible and consistent in its provisions, and disposes of all the testator's property, and there is nothing upon the face of it to indicate mental unsoundness, the testimony as to mental incapacity would have to be very strong and convincing to defeat such will. I do not mean to say that more than a preponderance would be required, but that the facts suggested make a very strong case in favor of mental capacity."

The testimony of the witnesses as to facts and circumstances on which their opinions rest may all be true, and yet the testatrix's mind may have been perfectly clear upon February 17th. Her attorney testifies that it was. Her acts are consistent with no other theory. And even Mrs. Gurd, who thinks that no sane woman would give the bulk of her property to a library association, admits that she saw nothing that day particularly indicative of incompetence.

We are not prepared to say that the court erred in admitting the opinion evidence, but we think he erred in modifying proponent's twelfth request by inserting the words inclosed in brackets in the following, which is a copy of the request:

" If you find from the evidence that Mrs. Terry made, in her own handwriting, a draft of her will, and at the time she made it she knew what she was doing, recalled to her mind at the time her property, her friends and relatives, and gave it to Mr. Plummer, and told him that was how she wanted to dispose of her property [and was then competent], and directed him to add to it a clause

disposing of the balance of her property to the Benton Harbor Library Association, then you will sustain the will."

In *Aikin* v. *Weckerly*, 19 Mich. 492, this court held. the following charge to state the law correctly:

"To make the testator competent, he must have sufficient active memory to recollect in his mind, without prompting, the elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive their obvious relations to each other, and to be able to form a rational judgment in regard to them; and it is not sufficient in law that the testator be of memory, when he makes his will, to answer familiar and usual questions."

The twelfth request embodied substantially all of this, if not more. It required that she be found to have performed the mental and manual labor of drawing her will, and that at the time she knew what she was doing, and recalled her property, her friends and relatives. If we give this language the meaning that the average man will attach to it,—and that is what we should do,—there is no reason for saying that it was not fairly comprehensive. Various judges have dressed this definition of testamentary capacity in different garbs, but it is the idea, and not the language of one or another judge, that is essential. We think the request sufficiently definite, under the proofs in this case. It was an attempt to give the jury a standard of mental capacity which they could use as a test. It was rendered abortive by inserting the additional words, "and was then competent." As well might the judge have omitted the request as drafted, and told the jury to sustain the will "if she was then competent."

The refusal to give the sixteenth request is not so clearly erroneous. It is as follows:

"If you find that the testatrix, on the 17th day of February, 1899, the date of the execution of the will in question, had the mental ability to draft a memorandum of the way she wanted to dispose of her property, and directed the disposal of the residue; if she remembered

that the interest on a certain mortgage was past due, and the interest on the mortgage *was* past due; that she indorsed a check according to the usual business methods; and that she wrote the letter of identification of her sister to the paying bank,—as a matter of law, the testatrix had the mental ability to execute the will in question."

Counsel assert that the record contains no evidence of the refusal to give these requests; but it appears on page 144 of the record, while the exceptions to these specific requests appear on page 134.

We also think the language of the court in arraying the witnesses against each other may have been harmful. There is much in the testimony of contestants' witnesses which militates against the correctness of their opinions, and tends to show testatrix's competency on February 17th. The testimony of Mr. Plummer was not necessarily inconsistent with that of the nurse and physician, and from their testimony the jury might well have hesitated to follow their expressed opinions as to her competency to make this will.

The order of the circuit court is reversed, with costs against contestants, and a new trial directed.

The other Justices concurred.